**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO. 14-cv-61263-DPG/WCT

MAKO SURGICAL CORP., a Delaware
corporation, and ALL-OF-INNOVATION
GMBH, a German corporation,

                Plaintiffs,

      vs.

BLUE BELT TECHNOLOGIES, INC., a
Pennsylvania corporation,

                Defendant.

_____/


**PLAINTIFF MAKO SURGICAL CORP.'S AMENDED ANSWER TO DEFENDANT
BLUE BELT TECHNOLOGIES, INC.'S COUNTERCLAIMS AND AFFIRMATIVE
DEFENSES AND COUNTERCLAIMS**


**AMENDED ANSWER**

Plaintiff Mako Surgical Corp. ("Mako") answers as follows in response to the

corresponding numbered paragraphs in Defendant Blue Belt Technologies, Inc.'s ("Blue Belt")

Counterclaims, dated July 10, 2014:

1.      In answer to paragraph 1 of the Counterclaims, Mako denies the allegations of

this paragraph.

**PARTIES**

2.      In answer to paragraph 2 of the Counterclaims, Mako lacks information sufficient

to form a belief about the truth of the allegations contained therein, and on that basis denies the

allegations.

3.      In answer to paragraph 3 of the Counterclaims, Mako admits that Mako is a corporation organized and existing under the laws of Delaware, and Mako maintains its principal place of business at 2555 Davie Road, Fort Lauderdale, Florida 33317.

4.      In answer to paragraph 4 of the Counterclaims, Mako lacks information sufficient to form a belief about the truth of the allegations contained therein, and on that basis denies the allegations.

## JURISDICTION

5.      In answer to paragraph 5 of the Counterclaims, Mako admits that an actual controversy exists under 35 U.S.C. §§ 2201 and 2202.

6.      In answer to paragraph 6 of the Counterclaims, Mako admits that this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(a), and 1338.

7.      In answer to paragraph 7 of the Counterclaims, Mako lacks knowledge or information sufficient to form a belief about the truth of this allegation and on that basis denies this allegation.

8.      In answer to paragraph 8 of the Counterclaims, Mako admits that Mako made a general appearance in this case, and Mako admits that Mako maintains its headquarters in Florida.  Mako does not contest, for the purposes of this action, that this Court has personal jurisdiction over Mako.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

9.      In answer to paragraph 9 of the Counterclaims, Mako admits that AOI made a general appearance in this case.  Mako lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies the remaining allegations.

10.     In answer to paragraph 10 of the Counterclaims, Mako does not contest, for the purposes of this action, that venue is proper in this District under 28 U.S.C. §§ 1391 and 1400. Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

## BACKGROUND

11.     In answer to paragraph 11 of the Counterclaims, Mako admits that Blue Belt sells products for use in the field of orthopedic surgery.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

12.     In answer to paragraph 12 of the Counterclaims, Mako lacks knowledge or information sufficient to form a belief about the truth of this allegation and on that basis denies this allegation.

13.     In answer to paragraph 13 of the Counterclaims, Mako admits that on December 10, 2012, Blue Belt announced it had received clearance from the Food and Drug Administration ("FDA") to market its NavioPFS orthopedic surgical system in the United States. Plaintiff admits that NavioPFS was approved for use in Unicondylar Knee Replacement ("UKR"), commonly known as partial knee replacement.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

14.     In answer to paragraph 14 of the Counterclaims, Mako denies the allegations of this paragraph.

15.     In answer to paragraph 15 of the Counterclaims, Mako admits that the NavioPFS costs less than the RIO Robotic Arm Interactive Orthopedic system.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

16.     In answer to paragraph 16 of the Counterclaims, Mako lacks knowledge or information sufficient to form a belief about the truth of this allegation and on that basis denies this allegation.

17.     In answer to paragraph 17 of the Counterclaims, Mako lacks information sufficient to form a belief as to the number of robotics-assisted UKR procedures performed in the United States annually, and denies these allegations on this basis.  Mako denies the remaining allegations of this paragraph.

18.     In answer to paragraph 18 of the Counterclaims, Mako lacks information sufficient to form a belief as to the allegations in this paragraph, and on this basis denies the allegations.

19.     In answer to paragraph 19 of the Counterclaims, Mako admits that Mako's RIO system relies on computed tomography ("CT") scans to map the desired haptic volume for the surgeon's hand-held cutting apparatus, which provides haptic sensory feedback to the surgeon when movements deviate from the desired path.

20.     In answer to paragraph 20 of the Counterclaims, Mako admits that the list price for a new RIO system exceeds $1 million, not including service costs.  Mako admits that service costs potentially could add $100,000 or more annually to the cost of owning a RIO system.

21.     In answer to paragraph 21 of the Counterclaims, Mako lacks information sufficient to form a belief as to the allegations in this paragraph, and denies these allegations on this basis.

22.     In answer to paragraph 22 of the Counterclaims, Mako denies the allegations of this paragraph.

23.     In answer to paragraph 23 of the Counterclaims, Mako lacks information sufficient to form a belief as to the number of NavioPFS systems sold since 2012, and denies these allegations on this basis.  Mako denies the remaining allegations of this paragraph.

24.     In answer to paragraph 24 of the Counterclaims, Mako denies the allegations of this paragraph.

25.     In answer to paragraph 25 of the Counterclaims, Mako denies the allegations of this paragraph.

26.     In answer to paragraph 26 of the Counterclaims, Mako admits that Mako has licensed, among other intellectual property, the '417 patent, which Mako admits is titled "Method and Device System for Removing Material or for Working Material."

27.     In answer to paragraph 27 of the Counterclaims, Mako admits that Mako licenses the '417 patent.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

28.     In answer to paragraph 28 of the Counterclaims, Mako admits that Plaintiffs have asserted the '417 patent against Blue Belt and NavioPFS in this action and seek damages and an injunction to remedy Blue Belt's infringement.

29.     In answer to paragraph 29 of the Counterclaims, Mako denies the allegations of this paragraph.

30.     In answer to paragraph 30 of the Counterclaims, Mako denies the allegations of this paragraph.

31.     In answer to paragraph 31 of the Counterclaims, Blue Belt purports to describe statements made by "a Mako senior executive" to "a consultant to Blue Belt" without offering a source for the information or any further detail about or context for these supposed statements. Consequently, Mako lacks information sufficient to form a belief about the statements allegedly made, and on that basis denies the allegations.

32.     In answer to paragraph 32 of the Counterclaims, Mako denies the allegations of this paragraph.

33.     In answer to paragraph 33 of the Counterclaims, Mako denies the allegations of this paragraph.

34.     In answer to paragraph 34 of the Counterclaims, Mako denies the allegations of this paragraph.

35.     In answer to paragraph 35 of the Counterclaims, with respect to alleged statements made by "a representative of Stryker Corporation" to "an employee from Think Surgical," Blue Belt does not offer a source for the information or any further detail about or context for these supposed statements.  Consequently, Mako lacks information sufficient to form a belief about the statements allegedly made, and denies these allegations on that basis.  Mako admits that Mako has an exclusive license to a Curexo patent and that in conjunction with this license Mako has discussed enforcement issues with Curexo.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

36.     In answer to paragraph 36 of the Counterclaims, Mako denies the allegations of this paragraph.

37.     In answer to paragraph 37 of the Counterclaims, Mako denies the allegations of this paragraph.

38.     In answer to paragraph 38 of the Counterclaims, Blue Belt purports to describe statements made by "Mako and its agents" without offering a source for the information, who it precisely it was supposedly said to, or any further detail about or context for these supposed statements.  Consequently, Mako lacks information sufficient to form a belief about the statements allegedly made, and on that basis denies the allegations.

39.     In answer to paragraph 39 of the Counterclaims, Blue Belt purports to describe statements made by "Mako representatives" without offering a source for the information or any further detail about or context for these supposed statements.  Consequently, Mako lacks information sufficient to form a belief about the statements allegedly made, and on that basis denies the allegations.

40.     In answer to paragraph 40 of the Counterclaims, Blue Belt purports to describe statements made by "Mako representatives" without offering a source for the information or any further detail about or context for these supposed statements.  Consequently, Mako lacks information sufficient to form a belief about the statements allegedly made, and on that basis denies the allegations.

41.     In answer to paragraph 41 of the Counterclaims, Blue Belt purports to describe statements made by "Mako representatives" without offering a source for the information or any further detail about or context for these supposed statements.  Consequently, Mako lacks information sufficient to form a belief about the statements allegedly made, and on that basis denies the allegations.

42.     In answer to paragraph 42 of the Counterclaims, Blue Belt purports to describe statements made by "Mako representatives" without offering a source for the information or any further detail about or context for these supposed statements.  Consequently, Mako lacks information sufficient to form a belief about the statements allegedly made, and on that basis denies the allegations.

43.     In answer to paragraph 43 of the Counterclaims, Blue Belt purports to describe statements made by "representatives of Mako and/or Stryker" without offering a source for the information or any further detail about or context for these supposed statements.  Consequently,

Mako lacks information sufficient to form a belief about the statements allegedly made, and on that basis denies the allegations.

44.     In answer to paragraph 44 of the Counterclaims, Mako denies that Bill Peters made the alleged statements.  Blue Belt also purports to describe statements made by "representatives of Mako and/or Stryker," without offering a source for the information or any context for these supposed statements.  Consequently, Mako lacks information sufficient to form a belief about the statements allegedly made by "representatives of Mako and/or Stryker," and on that basis denies the allegations.

45.     In answer to paragraph 45 of the Counterclaims, Mako lacks information sufficient to form a belief about the allegations in this paragraph, and on that basis denies the allegations.

46.     In answer to paragraph 46 of the Counterclaims, Mako admits that Andrew Whetsel contacted his friend, Andrew Camp, and that Mr. Whetsel told Mr. Camp that employment at Mako would present a good opportunity for Mr. Camp in the future if Mr. Camp were open to it.  Mr. Whetsel also asked Mr. Camp who from Blue Belt was covering New Jersey.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

47.     In answer to paragraph 47 of the Counterclaims, Mako admits that they received a letter from Blue Belt's attorneys on June 20, 2014, detailing eight alleged instances of unlawful practices under federal and state law and stating, in part, that Mako: "cease and desist from making false or misleading statements in the market about Blue Belt, . . . cease and desist from its other unfair and unlawful actions harming Blue Belt . . . . [and] cease and desist from efforts to interfere with the valid business and contractual relationships Blue Belt has with its customers,

prospective customers and employees." Mako admits that Mako responded to this letter on July 1, 2014, stating that Mako would investigate Blue Belt's grievances and that it took Blue Belt's allegations seriously. Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

48.     In answer to paragraph 48 of the Counterclaims, Mako admits that U.S. Patent No. 6,757,582 (the "'582 patent") is titled "Methods and Systems to Control a Shaping Tool," and on its face indicates that it issued on June 29, 2004 and it was assigned to Carnegie Mellon University. Mako lacks information sufficient to form a belief about the truth as to the remaining allegations, and on this basis denies the remaining allegations.

49.     In answer to paragraph 49 of the Counterclaims, Mako admits that it does not have a license to practice the '582 patent. Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

50.     In answer to paragraph 50 of the Counterclaims, Mako denies the allegations of this paragraph.

## BLUE BELT'S FIRST COUNTERCLAIM

51.     In answer to paragraph 51 of the Counterclaims, Mako incorporates its responses to and denials of each and every allegation of paragraphs 1 through 50 as set forth herein.

52.     In answer to paragraph 52 of the Counterclaims, Mako admits that Plaintiffs contend that the '417 patent is valid, that Blue Belt contends that the '417 patent is invalid, and that there is an actual, live controversy between Plaintiffs and Blue Belt concerning the validity of the '417 patent.

53.     In answer to paragraph 53 of the Counterclaims, Mako denies the allegations of this paragraph.

54.     In answer to paragraph 54 of the Counterclaims, Mako admits that Blue Belt seeks a declaration that each of the claims of the '417 patent is invalid.

**BLUE BELT'S SECOND COUNTERCLAIM**

55.     In answer to paragraph 55 of the Counterclaims, Mako incorporates its responses to and denials of each and every allegation of paragraphs 1 through 54 as set forth herein.

56.     In answer to paragraph 56 of the Counterclaims, Mako admits there is an actual, live controversy between Plaintiffs and Blue Belt as to Blue Belt's infringement of the '417 patent.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

57.     In answer to paragraph 57 of the Counterclaims, Mako denies the allegations of this paragraph.

58.     In answer to paragraph 58 of the Counterclaims, Mako admits that Blue Belt seeks a declaration that it has not and does not infringe any claim of the '417 patent.

**BLUE BELT'S THIRD COUNTERCLAIM**

59.     In answer to paragraph 59 of the Counterclaims, Mako incorporates its responses to and denials of each and every allegation of paragraphs 1 through 58 as set forth herein.

60.     In answer to paragraph 60 of the Counterclaims, Mako admits that Blue Belt is a competitor of Mako, at least because the parties each advertise and sell a product or service generally described as surgical equipment and technology in interstate commerce.

61.     In answer to paragraph 61 of the Counterclaims, Mako denies the allegations of this paragraph.

62.     In answer to paragraph 62 of the Counterclaims, Blue Belt purports that Mako made "advertisements" without offering a source for the information or any further detail about

the location or method of these "advertisements" or context for these supposed "advertisements."
Consequently, Mako lacks information sufficient to form a belief about the "advertisements"
allegedly made, and on that basis denies the allegations.  Mako denies the remaining allegations
of this paragraph.

63.     In answer to paragraph 63 of the Counterclaims, Mako denies the allegations of
this paragraph.

64.     In answer to paragraph 64 of the Counterclaims, Mako denies the allegations of
this paragraph.

## BLUE BELT'S FOURTH COUNTERCLAIM

65.     In answer to paragraph 65 of the Counterclaims, Mako incorporates its responses
to and denials of each and every allegation of paragraphs 1 through 64 as set forth herein.

66.     In answer to paragraph 66 of the Counterclaims, Blue Belt purports that Mako
made statements without offering a source for the information or any further detail about the
location or method of these statements or context for these supposed statements.  Consequently,
Mako lacks information sufficient to form a belief about statements allegedly made, and on that
basis denies the allegations.  Mako denies the remaining allegations of this paragraph.

67.     In answer to paragraph 67 of the Counterclaims, Mako denies the allegations of
this paragraph.

68.     In answer to paragraph 68 of the Counterclaims, Mako denies the allegations of
this paragraph.

69.     In answer to paragraph 69 of the Counterclaims, Mako denies the allegations of
this paragraph.

70.     In answer to paragraph 70 of the Counterclaims, Mako denies the allegations of this paragraph.

## BLUE BELT'S FIFTH COUNTERCLAIM

71.     In answer to paragraph 71 of the Counterclaims, Mako incorporates its responses to and denials of each and every allegation of paragraphs 1 through 70 as set forth herein.

72.     In answer to paragraph 72 of the Counterclaims, Blue Belt purports that Mako made statements without offering a source for the information or any further detail about the location or method of these statements or context for these supposed statements.  Consequently, Mako lacks information sufficient to form a belief about statements allegedly made, and on that basis denies the allegations.  Mako denies the remaining allegations of this paragraph.

73.     In answer to paragraph 73 of the Counterclaims, Mako denies the allegations of this paragraph.

74.     In answer to paragraph 74 of the Counterclaims, Mako denies the allegations of this paragraph.

## BLUE BELT'S SIXTH COUNTERCLAIM

75.     In answer to paragraph 75 of the Counterclaims, Mako incorporates its responses to and denials of each and every allegation of paragraphs 1 through 74 as set forth herein.

76.     In answer to paragraph 76 of the Counterclaims, Mako denies the allegations of this paragraph.

77.     In answer to paragraph 77 of the Counterclaims, Mako denies the allegations of this paragraph.

78.     In answer to paragraph 78 of the Counterclaims, Mako denies the allegations of this paragraph.

79.     In answer to paragraph 79 of the Counterclaims, Mako denies the allegations of this paragraph.

## BLUE BELT'S SEVENTH COUNTERCLAIM

80.     In answer to paragraph 80 of the Counterclaims, Mako incorporates its responses to and denials of each and every allegation of paragraphs 1 through 79 as set forth herein.

81.     In answer to paragraph 81 of the Counterclaims, Mako admits that the '582 patent is titled "Methods and Systems to Control a Shaping Tool," and on its face indicates that the U.S. Patent and Trademark Office issued the patent on June 29, 2004.  Mako lacks information sufficient to form a belief about the truth as to the remaining allegations, and on this basis denies the remaining allegations.

82.     In answer to paragraph 82 of the Counterclaims, Mako denies the allegations of this paragraph.

83.     In answer to paragraph 83 of the Counterclaims, Mako denies the allegations of this paragraph.

84.     In answer to paragraph 84 of the Counterclaims, Mako denies the allegations of this paragraph.

85.     In answer to paragraph 85 of the Counterclaims, Mako denies the allegations of this paragraph.

## BLUE BELT'S EIGHTH COUNTERCLAIM

86.     In answer to paragraph 86 of the Counterclaims, Mako incorporates its responses to and denials of each and every allegation of paragraphs 1 through 85 as set forth herein.

87.     In answer to paragraph 87 of the Counterclaims, Mako admits that the RIO Robotic Arm Interactive Orthopedic device and the Restoris line of implants are sold or offered

for sale by Mako.  Mako admits that Mako previously sold or offered for sale the TGS surgical robotic arm system.  Mako also admits that the TGS and RIO systems have a tactile robot arm and patient-specific visualization systems and that they continuously track and associate the location of both the robotic arm and diseased portions of the patient's joint.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

88.     In answer to paragraph 88 of the Counterclaims, Mako admits that Mako sells and offers for sale the RIO system and its components in the United States, including Florida.  Mako admits that Mako previously sold or offered for sale the TGS system and its components in the United States, including Florida.  Mako admits that Mako provides promotional and instructional materials and activities relating to MAKOplasty and the RIO system in the United States, including Florida.  Mako admits that Mako previously provided promotional and instructional materials and activities relating to the TGS system in the United States, including Florida.  Mako admits that Mako sometimes assists in procedures performed using the RIO system in the United States, including Florida.  Mako admits that Mako previously sometimes provided assistance in procedures using the TGS system in the United States, including Florida.  Except as expressly admitted, Mako denies the remaining allegations of this paragraph.

89.     In answer to paragraph 89 of the Counterclaims, Mako denies the allegations of this paragraph.

90.     In answer to paragraph 90 of the Counterclaim, Mako denies the allegations of this paragraph.  Mako denies any other allegation of the Counterclaim that has not been otherwise specifically admitted or responded to.

## RESPONSE TO BLUE BELT'S DEMAND FOR RELIEF

Mako denies that Blue Belt is entitled to any relief whatsoever, either legal or equitable, from Plaintiffs or from this Court.  Furthermore, Mako denies that this is an exceptional case such that an award of attorney fees to Blue Belt or an award of enhanced damages to Blue Belt is appropriate.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (Non-Infringement)

Mako has not infringed and does not directly infringe any valid and enforceable claim of the '582 patent, either literally, by application of the doctrine of equivalents, or by application of the reverse doctrine of equivalents; nor does Mako contribute to the infringement of, or actively induce others to infringe either literally or by application of the doctrine of equivalents, any valid and enforceable claim of the '582 patent.

### SECOND AFFIRMATIVE DEFENSE
### (Invalidity)

The claims of the '582 patent are invalid for failure to satisfy one or more requirements for patentability under United States patent law, including, but not limited to, 35 U.S.C. §§ 102, 103, and 112.

### THIRD AFFIRMATIVE DEFENSE
### (Prosecution History Estoppel)

Blue Belt is estopped from asserting the claims of the '582 patent against Mako in whole or in part under the doctrine of prosecution history estoppel.

## FOURTH AFFIRMATIVE DEFENSE
### (Limitation on Recovery of Costs)

On information and belief, Blue Belt is precluded from seeking recovery of its costs under the provisions of 35 U.S.C. § 288.

## FIFTH AFFIRMATIVE DEFENSE
### (Injury Not Immediate or Irreparable)

Blue Belt is not entitled to any injunctive relief because, *inter alia*, any alleged injury to Blue Belt is not immediate or irreparable, and Blue Belt has an adequate remedy at law for any alleged injury.

## SIXTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

Blue Belt's Counterclaims fail to state a claim upon which relief may be granted as to one or all of its claims.

## SEVENTH AFFIRMATIVE DEFENSE
### (Lack of Standing)

Blue Belt's Counterclaims are barred, in whole or in part, because Blue Belt does not have standing to assert its claims.

## EIGHTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

Blue Belt's Counterclaims are estopped, in whole or in part, by the equitable doctrine of unclean hands, as Blue Belt has engaged in the same kind of behavior it challenges.

## NINTH AFFIRMATIVE DEFENSE
### (Bad Faith)

Blue Belt's Counterclaims are barred, in whole or in part, by reason of Blue Belt's conduct and actions, which were made in bad faith.

### TENTH AFFIRMATIVE DEFENSE
### (No Injury)

Blue Belt's Counterclaims are barred, in whole or in part, because Blue Belt has suffered no injury or damage as a result of any act or conduct by Plaintiffs.

### ELEVENTH AFFIRMATIVE DEFENSE
### (Truth)

Blue Belt's Counterclaims are barred, in whole or in part, because Mako's alleged advertisements, representations, or statements that are the subject of the Counterclaims are true and not false or materially misleading.

### TWELFTH AFFIRMATIVE DEFENSE
### (Statements of Opinion or Puffery)

Blue Belt's Counterclaims are barred to the extent that Mako's alleged advertisements or representations that are the subject of the Counterclaims consist of non-actionable statements of opinion or puffery.

### THIRTEENTH AFFIRMATIVE DEFENSE
### (Fair Competition)

Blue Belt's Counterclaims are barred, in whole or in part, because Mako was justified and privileged in each and every alleged act Blue Belt claims constitute tortious interference due to the privilege of fair competition, and other privileges and justifications.  Mako's alleged acts were not wrongful or intentionally designed to induce a breach or disruption of any contract or economic relationship and Mako's state of mind was not malicious.  The actions alleged in Blue Belt's Counterclaims were at all times reasonable, privileged, and justified.

**FOURTEENTH AFFIRMATIVE DEFENSE**
**(Lack of Necessary Intent)**

Blue Belt is precluded from the recovery it seeks from Mako due to the lack of the necessary degree of scienter or intent on the part of Mako, who has, at all times, acted in good faith and without malice.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**(Failure to Mitigate)**

Blue Belt's Counterclaims are barred, in whole or in part, because Blue Belt has failed to mitigate its damages, if any.

**SIXTEENTH AFFIRMATIVE DEFENSE**
**(Laches)**

Blue Belt's Counterclaims are barred in whole or in part on the ground of laches.

**SEVENTEENTH AFFIRMATIVE DEFENSE**
**(Inequitable Conduct)**

The claims of the '582 patent are unenforceable for inequitable conduct due to the '582 patent's inventors and prosecution counsel, having a duty of candor and good faith in dealing with the United States Patent and Trademark Office ("PTO"), withholding material information with an intent to deceive the PTO.  Mako incorporates paragraphs 19 through 106 from the Third Counterclaim below, which provides the factual basis of the allegations in this paragraph, as if fully set forth herein.

**RESERVATION OF RIGHT TO SUPPLEMENT DEFENSES**

Mako reserves the right to supplement its Answer to Blue Belt's Counterclaims with additional defenses that are learned in the course of investigation and discovery.

## JURY DEMAND

Mako demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues presented by Blue Belt's Counterclaims that are so triable.

## COUNTERCLAIMS

Mako brings the following Counterclaims against Blue Belt, pursuant to Rule 13 of the Federal Rules of Civil Procedure, and allege as follows:

## PARTIES

1.      Mako is a corporation organized and existing under the laws of Delaware.  Mako maintains its principal place of business at 2555 Davie Road, Fort Lauderdale, Florida 33317.

2.      Blue Belt is a corporation organized and existing under the laws of Pennsylvania with its principal place of business at 2905 Northwest Boulevard, Suite 40, Plymouth, Minnesota 55441.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over Mako's counterclaims under 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

4.      This Court has personal jurisdiction over Blue Belt because Blue Belt made a general appearance in this case.

5.      Venue is proper in this District for Mako's counterclaims pursuant to 28 U.S.C. §§ 1391 and 1400.

## BACKGROUND

6.      In its Counterclaims, Blue Belt alleges to own and have the right to enforce U.S. Patent No. 6,757,582 (the "'582 patent").

7.      In its Counterclaims, Blue Belt alleges Mako has infringed the '582 patent.

8.      Mako denies that it infringes or has infringed any valid and enforceable claim of the '582 patent.  Mako further asserts that one or more claims of the '582 patent are invalid and/or unenforceable.

10.      Based on the foregoing, there is an actual, immediate, and justiciable controversy between Mako and Blue Belt regarding the validity, enforceability, and infringement of the '582 patent.

**FIRST COUNTERCLAIM**

**(Declaratory Judgment of Non-Infringement)**

11.      Mako incorporates and re-alleges paragraphs 1 through 10 of these Counterclaims as if fully set forth herein.

12.      Mako does not and has not infringed any valid and enforceable claim of the '582 patent, whether directly or indirectly, by inducement or contributory infringement, literally or under the doctrine of equivalents.

13.      There is an actual, live controversy between Mako and Blue Belt as to whether Mako infringes or has infringed the '582 patent.  Specifically, Blue Belt contends that Mako infringes the '582 patent, whereas Mako contends that it does not.

14.      Mako therefore seeks a declaration that it has not and does not infringe any valid and enforceable claim of the '582 patent, whether directly or indirectly, by inducement or contributory infringement, literally or under the doctrine of equivalents.

**SECOND COUNTERCLAIM**

**(Declaratory Judgment of Invalidity)**

15.      Mako incorporates and re-alleges paragraphs 1 through 14 of these Counterclaims as if fully set forth herein.

16.     One or more claims of the '582 patent are invalid for failure to comply with one or more requirements for patentability under the patent laws, including, but not limited to, 35 U.S.C. §§ 102, 103, 112, and the non-statutory doctrine of obviousness-type double patenting.

17.     There is an actual, live controversy between Blue Belt and Mako as to whether the '582 patent is valid.  Specifically, Blue Belt contends that it is valid and Mako contends that it is invalid.

18.     Mako therefore seeks a declaration that each of the claims of the '582 patent are invalid.

### THIRD COUNTERCLAIM

### (Declaratory Judgment of Unenforceability)

19.     Mako incorporates and re-alleges paragraphs 1 through 18 of these Counterclaims as if fully set forth herein.

20.     A justiciable controversy exits as to whether the '582 patent is unenforceable based on inequitable conduct, and a declaration from this Court should be issued finding the '582 patent to be unenforceable.

21.     The claims of the '582 patent are unenforceable for inequitable conduct due to the prosecuting attorney and inventors of the '582 patent withholding material information from the PTO with an intent to deceive.

### A.     Summary of Inequitable Conduct

22.     The prosecuting attorney and inventors of the '582 patent committed inequitable conduct by knowingly and intentionally failing to disclose in an Information Disclosure Statement ("IDS") material information of which they were aware with an intent to deceive the PTO.

23.     The prosecuting attorney and the inventors of the '582 patent had a duty to disclose to the PTO all information known to them to be material to patentability.  Each inventor signed a declaration acknowledging this duty.  Both the prosecuting attorney and the inventors had considerable experience with the patent process.  At the time of the prosecution of the '582 patent, the inventors possessed many patents, the prosecuting attorney was a skilled patent practitioner, and they had filed IDSs and submitted copies of references in earlier patent applications.  Thus, on information and belief, the prosecuting attorney and inventors understood the importance and relevance of submitting an IDS.  Yet, none of them submitted *any* prior art references to the PTO in an IDS during prosecution of the '582 patent.

24.     For example, the prosecuting attorney and the inventors of the '582 patent failed to submit a material, non-cumulative journal article by Russell H. Taylor, et al., entitled "An Image-Directed Robotic System for Precise Orthopaedic Surgery" and published in IEEE Transactions on Robotics and Automation, Volume 10, Number 3 in June 1994 ("the Taylor article").

25.     As another example, they did not submit a material, non-cumulative review article co-authored by Anthony DiGioia, III and Branislav Jaramaz, two of the '582 patent inventors ("the DiGioia article).  The article is entitled "Computer Assisted Orthopaedic Surgery: Image Guided and Robotic Assistive Technologies" and it was published in a book edited by Mr. DiGioia and entitled *Clinical Orthopaedics and Related Research*.

26.     For information to be considered by the PTO, PTO procedures require that an IDS be filed, and a copy of non-patent publications should be submitted.  (*See* Manual of Patent Examining Procedure ("MPEP") § 609; 37 CFR § 1.98(a)(1) and (2).)  The Taylor and DiGioia

articles were neither listed in an IDS nor were copies of the articles provided to the patent examiner during prosecution of the '582 patent.

27.    Because the prosecuting attorney and the inventors failed to submit any references to the PTO, including the Taylor and DiGioia articles, the examiner was left to look for himself for relevant prior art.  He found a total of five references, and not a single one of these references was a computer or robotic controlled surgery system.

28.    When the prosecuting attorney and inventors received the first office action during prosecution of the '582 patent, they learned that the examiner had already allowed many of their claims.  He had only rejected some of them based upon a computerized *lumber saw patent that was owned by a Canadian forestry company*.

29.    Even though they still had an opportunity to rectify their omission after receiving the office action and were put on notice that the examiner failed to consider any robot or computer-controlled surgical systems, the prosecuting attorney and inventors knowingly proceeded with claim amendments to overcome the lumber saw patent without submitting robot or computer-controlled surgical system prior art.  The single most reasonable explanation for this behavior is that the prosecuting attorney and the inventors made a conscious decision with an intent to deceive to withhold critical prior art in order to get the '582 patent issued.

**B.    Prosecution History of the '582 patent**

30.    According to the Abstract of the '582 patent, the alleged invention discloses "[a] method and system for providing control that include providing a workpiece that includes a target shape, providing a cutting tool, providing a 3-D image associated with the workpiece, identifying the target shape within the workpiece image, providing a 3-D image associated with the cutting tool, registering the workpiece with the workpiece image, registering the cutting tool

with the cutting tool image, tracking at least one of the workpiece and the cutting tool,

transforming the tracking data based on image coordinates to determine a relationship between

the workpiece and the cutting tool, and, based on the relationship, providing a control to the

cutting tool."

31.     The non-provisional application that led to the '582 patent was U.S. Patent

Application No. 10/427,093 ("the '093 application"), which was filed on or around

April 30, 2003.

32.     The application for the '582 patent was prosecuted by Kevin A. Oliver ("the

prosecuting attorney"), formerly of the law firm Foley Hoag, LLP.  On information and belief,

Mr. Oliver was involved in, at least, drafting claims and participating in interviews with the

examiner during prosecution of the patent.

33.     The '582 patent lists Gabriel Brisson, Takeo Kanade, Anthony DiGioia, III, and

Branislav Jaramaz ("the inventors") as inventors.

34.     The '582 patent lists Carnegie Mellon University as the original assignee.  On

July 8, 2014, just two days before Blue Belt filed their counterclaims asserting the '582 patent,

Carnegie Mellon University assigned the '582 patent to Blue Belt, while retaining a security

interest in the patent.  This assignment was recorded with the PTO on July 11, 2014, the day

after Blue Belt asserted its counterclaims.

35.     The '582 patent claimed priority to the U.S. Provisional Application

No. 60/377,695, which was filed on or about May 3, 2002 and expired before the issuance of any

patent.

36.     During prosecution of the '582 patent, the prosecuting attorney and inventors

never submitted any prior art in an IDS.

37.     On October 9, 2003, patent examiner Albert William Paladini sent a non-final rejection of the application.  The examiner rejected some of the application's claims as anticipated by U.S. Patent No. 6,520,228 ("the '228 patent)—a patent dealing with lumber saws—or dependent upon these rejected claims and determined some claims were allowable subject matter because:

> None of the references cited or the art searched disclose or teach alone or in combination the cutting tool system configurations recited which include the limitations of registering the workpiece with the workpiece image and the cutting tool with the cutting tool image, the ultrasonic lithotriptor, the RF marker and ultrasound source, the register and image, the bone cartilage, the collision detection and intersection modules, the classification of voxels and target shapes, and the bone in conjunction and in the same relationship with the other elements of the claims.

The examiner cited U.S. Patents Nos. 4,660,573 and 5,449,363 relating to ultrasonic and endoscopic lithotriptors; 6,097,168 and 6,501,997, relating to position control apparatuses in machining; and the previously mentioned 6,520,228 patent dealing with lumber saws, as prior art considered in making this determination.  This prior art was identified by the examiner, as the inventors and prosecuting attorney supplied no prior art.

38.     Even after being put on notice that the examiner was focused on machining and lumber saw references rather than robot or computer-controlled surgical systems, the prosecutors and inventors still did not rectify their omission by submitting prior art in an IDS.

39.     Instead, on or about January 9, 2004, the prosecuting attorney and inventors knowingly amended the claims in the application, stating that the amendments were "not related to patentability, and [were] presented to correct typographical and form matters" to "traverse the Examiner's rejection of all pending claims."  Their amendment focused on the '228 patent about lumber saws that was cited by the Examiner, but did not reference any other prior art.

40.     After these amendments and a further amendment by the examiner, the

'582 patent issued on June 29, 2004.

41.     At no time during the prosecution of the '582 patent did the prosecuting attorney

or inventors submit an IDS with any prior art to the examiner.  On information and belief, they

made a conscious decision not to submit any prior art in an IDS.

### C.     The Prosecuting Attorney for the '582 Patent

42.     Kevin Oliver, the prosecuting attorney for the '582 patent, had a number of years

of experience as a patent attorney by the time the patent issued.

43.     Mr. Oliver obtained his Bachelor of Science degree in Electrical Engineering

from Worcester Polytechnic Institute in 1986, his Master of Science degree in

Electric Engineering from University of Southern California in 1988, and his Juris Doctorate

from Suffolk University in 1994.

44.     According to the PTO's website, Mr. Oliver has been registered with the PTO as

an attorney since April 28, 1998.

45.     At the time of prosecution of the '582 patent, Mr. Oliver was a patent attorney at

Foley Hoag LLP, where, on information and belief, he prosecuted patents in the

electrical/mechanical arts, including software, fiber optics, and imaging.  By 2004, the year the

'582 patent issued, he was a partner at Foley Hoag.

46.     Based on his experience as a patent attorney, on information and belief,

Mr. Oliver understood the importance and relevance of submitting an IDS.  He failed, however,

to do so during prosecution of the '582 patent.

### D.    The Inventors of the '582 Patent

47.    The '582 patent lists Gabriel Brisson, Takeo Kanade, Anthony DiGioia, III, and Branislav Jaramaz as the inventors.

48.    Mr. DiGioia obtained his Bachelor of Science degree in Civil Engineering, and his Master of Science degree in Biomedical Engineering from Carnegie Mellon in 1982, and received his M.D. from Harvard.  Mr. Jaramaz received a Ph.D. in Computational Mechanics from Carnegie Mellon University in Pittsburgh in 1992.  Mr. Brisson received his Ph.D. in Robotics from Carnegie Mellon University in 2008.  Mr. Kanade received his Bachelor of Science degree, Master of Science degree, and Ph.D. in Electrical Engineering from Kyoto University in 1973.

49.    Three of the inventors—Mr. Kanade, Mr. DiGioia, and Mr. Jaramaz—are long-standing members of the Medical Image Computing and Computer-Assisted Interventions group, which publishes annual conference proceedings.

50.    The inventors had vast experience with the patent prosecution process.  For example, at the time the inventors filed their application for the '582 patent, Mr. Kanade had at least twenty-one issued patents to his name and at least nine applications that would become patents.  Mr. DiGioia and Mr. Jaramaz each had at least five issued patents to their names at the time the application was filed.

51.    In addition, the inventors had filed IDSs and submitted copies of references in their earlier patent applications.  Even in a related "child" patent application of the '582 patent, filed after the '582 patent was allowed, the inventors submitted an IDS.  Thus, on information and belief, the inventors understood the importance and relevance of submitting these disclosures.  They failed, however, to do so during prosecution of the '582 patent.

### E.       Obligations of the Prosecuting Attorney and the Inventors to the PTO

52.     The prosecuting attorney and the inventors directed and controlled what information was disclosed to the PTO concerning the '582 patent, including, for example, prior art references or the lack thereof.

53.     Pursuant to 37 C.F.R. § 1.56, the prosecuting attorney and the inventors, as individuals associated with the filing and prosecution of the patent application that became the '582 patent, owed a duty of candor and good faith in their dealings with the PTO.

54.     37 C.F.R. § 1.56 also required the prosecuting attorney and the inventors, as individuals associated with preparing and prosecuting the patent application that became the '582 patent, to disclose information known to them to be material to patentability.

55.     This duty to disclose material information was ongoing through the entire prosecution of the '582 patent.

56.     During prosecution of the '582 patent, all of the listed inventors signed a declaration swearing that they "acknowledge the duty to disclose to the United States Patent and Trademark Office all information known to me/us to be material to patentability as defined in 37 CFR § 1.56."

57.     According to MPEP § 2001, the duty to disclose is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the PTO or submitted to the Office in the manner described by 37 C.F.R. §§ 1.97(b)-(d) and 1.98.

58.     In order to have information considered by the PTO during the pendency of a patent application, an IDS must be filed in accordance with PTO content and procedural requirements.  (MPEP §609.)

59.     According to 37 CFR § 1.98(a)(1) and (2), an IDS must include not only a list of all patents, applications, or other information, but also a legible copy of each publication that is not a U.S. patent or U.S. patent application.

60.     Despite these requirements, the prosecuting attorney and inventors of the '582 patent never submitted an IDS to the PTO that disclosed any prior art or any information material to patentability of the '582 patent.

61.     The prosecuting attorney and inventors breached their duty of candor, good faith, and honesty to the PTO and engaged in inequitable conduct by knowingly and intentionally failing to disclose in an IDS material, non-cumulative prior art known to them or others involved in prosecution of the '582 patent.

### F.     Exemplary Undisclosed Prior Art Reference:  the Taylor Article

62.     The prosecuting attorney and inventors did not disclose any prior art in an IDS to the PTO, including the Taylor article, as described below.

63.     In prior patent applications, the inventors of the '582 patent filed Information Disclosure Statements.  For example, three of the four '582 patent inventors—Mr. DiGioia, Mr. Jaramaz, and Mr. Kanade—filed U.S. Patent Application No. 09/189,914, which later issued as U.S. Patent No. 6,205,411.  While prosecuting the '411 patent in 1999, these inventors submitted an IDS.  The IDS listed numerous patents and journal articles.

64.     This 1999 IDS submission included a journal article by Russell H. Taylor, et al., entitled "An Image-Directed Robotic System for Precise Orthopaedic Surgery" and published in June 1994 in IEEE Transactions on Robotics and Automation, Volume 10, Number 3.

65.     Despite their knowledge of the Taylor article, the prosecuting attorney and inventors of the '582 patent did not submit it in an IDS.

66.     The prosecuting attorney and the inventors were required to not only list the Taylor article, a non-patent publication, in an IDS, during prosecution of the '582 patent, but they were also required to submit a legible copy to the examiner.  (*See* 37 CFR § 1.98(a)(1) and (2) (stating that an IDS shall include not only a list of all patents, applications, or other information, but also a legible copy of each publication that is not a U.S. patent or U.S. patent application publication).)  Moreover, because the Taylor article was a non-patent publication, the patent examiner for the '582 patent, on information and belief, did not have direct access to the reference.

67.     The PTO would not have allowed claims 1-6, 8-10, 12-14, 16-17, 19-30, 34-42, 47, 50, and 53-58 of the '582 patent to issue but for the failure to disclose the Taylor article in an IDS.

68.     According to 37 CFR § 1.56, information is material when it is not cumulative to information already of record, and by itself or in combination establishes a prima facie case of unpatentability.

69.     The Taylor article is material and non-cumulative prior art to the '582 patent, and it anticipates many of the issued claims of the'582 patent.

70.     The Taylor article constitutes material prior art at least with respect to the '582 patent claims related to providing control that includes providing a workpiece that includes a target shape, providing a cutting tool, providing an image associated with the workpiece and the cutting tool, registering the workpiece with the workpiece image, registering the cutting tool with the cutting tool image, and providing a control to the cutting tool.

71.     For example, claim 1 of the '582 patent covers a system comprising: a cutting tool; a workpiece that includes a target shape; a tracker to provide tracking data associated with

the cutting tool and the workpiece; where the tracker includes at least one of: at least one first marker associated with the workpiece, and at least one second marker associated with the cutting tool; a controller to control the cutting tool based on the tracking data associated with the cutting tool and the tracking data associated with the workpiece.

72.   The Taylor article discloses an image-directed robotic system to augment the performance of human surgeons in precise bone machining procedures in orthopedic surgery.

73.   The system described in the Taylor article includes a ball probe cutter that is inserted into the collet of the cutting tool and provides "positioning of a 3D CAD model of the desired prosthesis shape relative to the CT image of the patient's anatomy." (Taylor, at 263, 267.) The workpiece is the patient and the target shape is the 3D CAD model of the desired prosthesis shape. The system includes "specialized IO hardware… to track the position and orientation of the robot end effector during the cutting phase of the surgery" (*Id.* at 265), which is the data associated with the cutting tool. The system also verifies "that the bone does not move relative to the fixator" (*Id.* at 270) and also includes tracking data of the patient's bone, i.e., the workpiece.

74.   The Taylor article also discloses the following: "Before surgery, three titanium pins are implants through small skin incisions into the greater trochanter and condyle of the patient's femur." (*Id.* at 262). These pins are markers associated with the workpiece. During the procedure, the cutting tool is used to contact each pin, to generate pin location information and register the CT and robot coordinates. (*Id.* at 263.) This pin finding routine is repeated during the procedure. (*Id.* at 268.) A PC card with eight tracking beacons is attached to the robot, and in conjunction with an Optotrack 3D digitizer, is used to track the position of the cutting tool. (*Id.* at 270.) Thus, the beacons are the markers associated with the cutting tool.

75. The Taylor article system is configured to "monitor the position of the robot's cutting tool relative to the shape that it is supposed to cut and stop cutting it is strays out of the desired volume for any reason." (*Id.* at 264.) Thus, the system controls the cutting tool based upon tracking information associated with the cutting tool. The system also "detects possible shifts of the bone" and if detected "a freeze motion signal is sent to the robot controller." (*Id.* at 265.)

76. Most of the '582 patent claims are disclosed in the Taylor article. Accordingly, the PTO would not have allowed claims 1-6, 8-10, 12-14, 16-17, 19-30, 34-42, 47, 50, and 53-58 of the '582 patent to issue had the Taylor article been disclosed to the PTO in an IDS.

## G. Exemplary Undisclosed Prior Art Reference: the DiGioia Article

77. The prosecuting attorney and inventors also failed to disclose the DiGioia article in an IDS during prosecution of the '582 patent.

78. In 1998, about five years prior to the filing of the application leading to the '582 patent, two of the '582 patent inventors—Mr. DiGioia and Mr. Jaramaz—co-authored a review article ("the DiGioia article"), which was published in a robotic surgical systems book that was edited by Mr. DiGioia. (Anthony M. DiGioia et al., *Computer Assisted Orthopaedic Surgery: Image Guided and Robotic Assistive Technologies*, Clinical Orthopaedics and Related Research (DiGioia, Guest Ed.), September 1998, No. 354, pp. 8-16.)

79. The DiGioia article described the state of the art for robotic surgical systems in 1998, including robot-assisted surgical systems that anticipate at least claims 1-3, 6, and 12-14 of the '582 patent.

80. Despite their knowledge of the DiGioia article, the prosecuting attorney and inventors of the '582 patent did not submit it in an IDS.

81.     The prosecuting attorney and the inventors were required to not only list the DiGioia article, a non-patent publication, in an IDS, during prosecution of the '582 patent, but they were also required to submit a legible copy to the examiner.  (*See* 37 CFR § 1.98(a)(1) and (2) (stating that an IDS shall include not only a list of all patents, applications, or other information, but also a legible copy of each publication that is not a U.S. patent or U.S. patent application publication).)  Moreover, because the DiGioia article was a non-patent publication, the patent examiner for the '582 patent, on information and belief, did not have direct access to the reference.

82.     The PTO would not have allowed claims 1-3, 6, and 12-14 of the '582 patent to issue but for the failure to disclose the DiGioia article in an IDS.

83.     According to 37 CFR § 1.56, information is material when it is not cumulative to information already of record, and by itself or in combination establishes a prima facie case of unpatentability.

84.     The DiGioia article is material and non-cumulative prior art to the '582 patent, and it anticipates a number of the issued claims of the'582 patent.

85.     The DiGioia article constitutes material prior art at least with respect to the '582 patent claims related to providing control that includes providing a workpiece that includes a target shape, providing a cutting tool, providing an image associated with the workpiece and the cutting tool, registering the workpiece with the workpiece image, and providing a control to the cutting tool.

86.     For example, claim 1 of the '582 patent covers a system comprising: a cutting tool; a workpiece that includes a target shape; a tracker to provide tracking data associated with the cutting tool and the workpiece; where the tracker includes at least one of: at least one first

marker associated with the workpiece, and at least one second marker associated with the cutting tool; a controller to control the cutting tool based on the tracking data associated with the cutting tool and the tracking data associated with the workpiece.

87.     The DiGioia article discloses general features of computer-assisted orthopedic surgical systems.

88.     The DiGioia article indicates that tools that may be used with a system may include "any tools such as drills, reamers…" which are cutting tools.  (DiGioia, at 11.)  In one example, the article describes one procedure where the workpiece is the femur, and the target shape is "the cavity for the femoral portion of an uncemented hip implant from a surgeon generated preoperative plan."  (*Id.* at 14.)

89.     DiGioia indicates that "the most common tracking devices sense position using optical cameras and infrared light emitting diodes."  (*Id.* at 11).  DiGioia further states that the "strategy is to attach tracking devices to the bones of interest and to any tools."

90.     As noted above, the DiGioia article describes a tracking device attached to the bone and a tracking device attached to a cutting tool.  The article provides a specific example in Figure 3 in which a first tracking array is attached to a pelvic bone and a second tracking array is attached to a surgical tool.

91.     The DiGioia article describes semi-active computer-assisted surgical systems where "the surgical action is physically constrained to follow a predefined strategy.  The action is guided, which means that the intervention is performed with respect to a previously defined strategy, but the final control and action still depends on the surgeon."  (*Id.* at 12).  The robotic constraint system  utilizes tracking data to constrain the movement of the cutting tool, based upon the target shape in the workpiece.

92.     In addition to disclosing material claimed by the '582 patent, several statements in the DiGioia article directly contradict the inventors' characterization of the prior art in the '582 patent.

93.     In one example, the Background section of the '582 patent states that bone fixation is used for "robotic orthopedic surgery systems because such systems depend on a fixed target and cannot or do not track the target."  However, in the DiGioia article, Mr. DiGioia and Mr. Jaramaz already describe tracking systems that "know at all times where bone structure and tools are located and how they may move or change orientation during the course of a procedure" and are "very accurate" and have "fast sensing rates of as many as 100 measurements per second, and can track multiple tools simultaneously."

94.     In another example, the Background section of the '582 patent states that prior art robotic systems have "undetectable failures, since the operator may not be in full or even partial physical control of the robot."  Yet, in the DiGioia article, Mr. DiGioia and Mr. Jaramaz discuss semi-active surgery systems where "the surgical action is physically constrained to follow a predefined strategy.  The action is guided, which means that the intervention is performed with respect to a previously defined strategy, *but the final control and action still depends on the surgeon*."

95.     These statements in the Background section of the '582 patent clearly mischaracterize the prior art as of 2003, when the '582 patent was filed.  Furthermore, if the Background section of the '582 patent is compared to the DiGioia article written by Mr. DiGioia and Mr. Jaramaz, this mischaracterization and deception appears to be intentional, absent a submission by the inventors of an IDS to correct the mischaracterization.

96.     Because of these disclosures in the DiGioia article, the PTO would not have allowed claims 1-3, 6, and 12-14 of the '582 patent to issue had the DiGioia article been disclosed to the PTO in an IDS.

### H.     Intent to Deceive the PTO

97.     Taking into account the evidence and circumstances surrounding the prosecution of the '582 patent, as set forth above, the single most reasonable inference is that, on information and belief, the prosecuting attorney and inventors knowingly and intentionally deceived the PTO while prosecuting the '582 patent when they failed to disclose the Taylor and DiGioia articles to the PTO in an IDS.

98.     The prosecuting attorney and inventors, who had a duty of candor to the PTO, committed inequitable conduct during prosecution of the '582 patent by knowingly and intentionally withholding material, non-cumulative information.

99.     Despite their obligations under 37 C.F.R. §1.56, despite the inventors executing a declaration that reminded and put them on notice of their obligation, and despite having a final opportunity to submit prior art when the prosecuting attorney and inventors amended the pending claims to overcome the lumber saw reference identified by the patent examiner, they failed to submit relevant prior art that they submitted in previous patent filings, including the Taylor and DiGioia articles, with the intent to deceive the PTO.

100.    The prosecuting attorney and inventors were aware of the Taylor article at the time they filed claim amendments and made arguments against prior art identified by the examiner during prosecution of the '582 patent, because they had cited to the Taylor article in their previous patent application during prosecution of the '411 patent.

101.    On information belief, at least some of the inventors of the '582 patent also collaborated with Russell Taylor, the author of the 1994 article.  For example, in a September 1998 news release, Carnegie Mellon University announced the partnership of '582 patent inventor Takeo Kanade of Carnegie Mellon with Russell Taylor of Johns Hopkins in a new Engineering Research Center in Computer-Integrated Surgical Systems and Technology.  Mr. DiGioia also served on the board of the Medical Image Computing and Computer-Assisted Interventions group at the same time as Mr. Taylor.

102.    Furthermore, for years, Mr. DiGioia was involved in the International Society for Computer Assisted Orthopaedic Surgery ("CAOS"), which includes the world's leading experts in the fields of computer and robotic assistance in orthopaedic surgery, and he was the President of CAOS before filing the '582 patent and during its prosecution.  Thus, he held deep knowledge about orthopedic robotics yet did not reference any prior art in an IDS during prosecution of the '582 patent.

103.    In addition, at least some of the inventors were aware of the DiGioia article at the time they filed claim amendments and made arguments against prior art identified by the examiner during prosecution of the '582 patent, because two of them—Mr. DiGioia and Mr. Jaramaz—co-authored the article.

104.    The inventors were well aware of the prior art in the field, specifically the Taylor and DiGioia articles, which predated the 2003 filing of the '093 application that led to issuance of the '582 patent.

105.    The failure to notify the PTO of the Taylor and DiGioia articles in an IDS during prosecution of the '582 patent, despite the fact that the information was material to the

patentability of the claims, coupled with the intent to deceive the PTO, renders the '582 patent unenforceable due to inequitable conduct.

106.    Mako therefore seeks a declaration that each of the claims of the '582 patent are unenforceable.

## DEMAND FOR RELIEF

Mako prays that this Court grant the following relief:

A.    Dismiss Blue Belt's Counterclaims with prejudice;

B.    Enter a judgment in favor of Mako and against Blue Belt on all claims in Blue Belt's Counterclaims;

C.    Declare that Mako has not infringed and currently is not infringing any claims of the asserted patents;

D.    Declare that Blue Belt's asserted '582 patent is invalid and unenforceable;

E.    Deny Blue Belt's request for damages and injunctive relief;

F.    Declare this to be an exceptional case under 35 U.S.C. § 285 and award Mako its attorney's fees and costs; and

G.    Grant Mako such other relief as is just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mako hereby demands trial by jury for all issues so triable.

Dated: August 25, 2014                    Respectfully submitted,

                                          /s/ Humberto H. Ocariz

                                          Humberto H. Ocariz
                                          HOcariz@shb.com
                                          Florida Bar No.: 740860

Shook Hardy & Bacon LLP
Miami Center, Suite 3200
201 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

Wesley Overson (*Pro hac vice*)
WOverson@mofo.com
Danielle Coleman (*Pro hac vice*)
DColeman@mofo.com
Elizabeth Patterson (*Pro hac vice*)
EPatterson@mofo.com
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Wendy Ray (*Pro hac vice*)
WRay@mofo.com
Morrison & Foerster LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017
Telephone: (213) 892-5200
Facsimile: (213) 892-5454

*Attorneys for Plaintiffs*
*MAKO Surgical Corp. and*
*All-Of-Innovation GmbH*