UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 1:14-CV-61263-DPG/WCT

MAKO SURGICAL CORP.,
a Delaware corporation,
ALL-OF-INNOVATION GMBH,
a German corporation,

                Plaintiffs,

      vs.

BLUE BELT TECHNOLOGIES, INC.,
a Pennsylvania corporation,

                Defendant.

_____/

**DEFENDANT BLUE BELT TECHNOLOGIES, INC.'S ANSWER TO PLAINTIFFS'
MAKO SURGICAL CORP. & ALL-OF-INNOVATION GMBH FIRST AMENDED
COMPLAINT; AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

Defendant Blue Belt Technologies, Inc. ("Blue Belt"), for itself and no other party, answers as follows in response to the corresponding numbered paragraphs in Plaintiff Mako Surgical Corp.'s ("Mako") and All-of-Innovation GmbH's ("AOI") (collectively, "Plaintiffs") First Amended Complaint ("FAC"), Dkt. 41, dated September 2, 2014:

**AS TO "PARTIES"**

1.       Blue Belt lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 1 of the FAC and on that basis denies the same.

2.       Blue Belt lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 2 of the FAC and on that basis denies the same.

3.      Blue Belt admits that it is a corporation organized and existing under the laws of the State of Pennsylvania, with a principal place of business at 2905 Northwest Boulevard, Suite 40, Plymouth, Minnesota 55441.

## AS TO "JURISDICTION AND VENUE"

4.      Blue Belt admits that Mako purports to bring an action for patent infringement under 35 U.S.C. § 271 *et seq*., false advertising under 15 U.S.C. § 1125(a)(1)(B), and violations of Florida statutory and common law, though Blue Belt denies that any Plaintiffs are entitled to any relief relating thereto.  Blue Belt lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 4 of the FAC and on that basis denies the same.

5.      Blue Belt does not contest that, for purposes of this action, this Court has personal jurisdiction over Blue Belt.  Except as expressly admitted, Blue Belt denies the allegations of Paragraph 5 of the FAC.

6.      Blue Belt does not contest that, for purposes of this action, this Court has personal jurisdiction over Blue Belt.  Except as expressly admitted, Blue Belt denies the allegations of Paragraph 6 of the FAC.

7.      Blue Belt does not contest, for the purposes of this action, that venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.  Except as expressly admitted, Blue Belt denies the allegations of Paragraph 7 of the FAC.

## AS TO "BACKGROUND"

8.      Blue Belt admits that Mako markets a product and/or service called "MAKOplasty," used with respect to knee and hip arthroplasty; Blue Belt denies the remaining allegations of Paragraph 8 of the FAC.

9.     Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to the date Mako was founded or as to the number of U.S. and foreign patents and patent applications Mako has, and on that basis denies said allegations; Blue Belt denies the remaining allegations in Paragraph 9 of the FAC.

10.     Blue Belt admits that Mako markets products and/or services called "MAKOplasty," the RIO Robotic Arm Interactive Orthopedic device, and Restoris implants in the United States.  Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to all the specific location(s) in which these products and/or services are offered or specifically how many procedures have been performed, and denies these allegations on this basis.  Blue Belt denies the remaining allegations of Paragraph 10 of the FAC.

11.     Blue Belt denies the allegations of Paragraph 11 of the FAC.

12.     Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to purported rankings or honors regarding Mako and/or its products and/or services, and denies these allegations on this basis.  Blue Belt denies the remaining allegations of Paragraph 12 of the FAC.

13.     Blue Belt denies the allegations of Paragraph 13 of the FAC.

14.     Blue Belt admits that Mako's products and/or services are sold and/or offered for sale in the United States; Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to the remaining allegations of Paragraph 14 of the FAC, and denies these allegations on this basis.

15.     Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to purported rankings or honors regarding Tim Lüth, and denies these allegations on this basis; Blue Belt denies the remaining allegations of Paragraph 15 of the FAC.

16.     Blue Belt admits that on December 10, 2012, Blue Belt issued a press release announcing that it received clearance from the Food and Drug Administration ("FDA") to market its NavioPFS® orthopedic surgical system in the United States, and that NavioPFS® was approved at that time for use in Unicondylar Knee Replacement ("UKR"); Blue Belt denies the remaining allegations of Paragraph 16 of the FAC.

17.     Blue Belt admits that its 510(k) Summary to FDA describes the NavioPFS® as "a computer-assisted orthopedic surgical navigation and surgical burring system."  Blue Belt admits that the same document states that the NavioPFS® "uses established technologies of navigation via a passive infrared tracking camera to aid the surgeon in establishing a bone surface model for the target surgery and to plan the surgical implant location based on predefined bone landmarks and known configuration of the surgical implant"; and that it further states that the system "aids the surgeon in executing the surgical plan by using a standard off-the-shelf surgical drill motor and bur . . . which has been adapted using a tracking system."  Blue Belt admits that the same document further states that the NavioPFS® "software controls the position of the tip of the surgical bur relative to the end of a guard attached to the handpiece," and notes that "[a]s the planned surface is reached the tip of the bur is fully retracted within the guard."  Blue Belt admits that the same document states that "[a]n alternative mode of operation is speed control mode," in which "the speed of the bur is controlled and the bur stops as the planned surface is reached." Blue Belt denies the remaining allegations of Paragraph 17 of the FAC.

18.     Paragraph 18 of the FAC purports to quote statements by Blue Belt without offering a source for those statements.  Consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to the allegations of Paragraph 18 of the FAC, and denies these allegations on this basis.

19.     Blue Belt admits that it has sold and/or offered to sell NavioPFS® systems in the United States, and has offered to sell NavioPFS® systems in the State of Florida.  Except as expressly admitted, Blue Belt denies the allegations of Paragraph 19 of the FAC.

20.     Blue Belt admits that Blue Belt has engaged in certain marketing activities with regard to the NavioPFS® system in the United States, including in the State of Florida.  Blue Belt admits that it offers certain informational and instructional content to actual and potential customers for the NavioPFS® system.   Except as expressly admitted, Blue Belt denies the allegations of Paragraph 20 of the FAC.

21.     Blue Belt denies the allegations of Paragraph 21 of the FAC.

22.     Blue Belt admits that representatives of Blue Belt attended the Computer Assisted Orthopaedic Surgery International meeting in Milan that took place from June 18-21, 2014.  The remainder of Paragraph 22 of the FAC purports to quote presentations and representations made by Blue Belt without specifying their source.  Consequently, except as expressly admitted, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to the allegations of Paragraph 22 of the FAC, and denies these allegations on this basis.

23.     Blue Belt denies the allegations of Paragraph 23 of the FAC.

24.     Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to all of Mako's accuracy claims or their foundation, and denies these allegations on this basis.  Mako's remaining allegations appear to be based on a particular study or particular studies, but those studies are not identified; consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth of these allegations and denies them on that basis.  Blue Belt denies the remaining allegations of Paragraph 24 of the FAC.

25.     Paragraph 25 of the FAC purports to quote studies allegedly relied upon by Blue Belt without identifying those studies, and, consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to these allegations.  Mako's allegations regarding "MAKO data" appear to be based on a particular study or particular studies, but those studies are not identified; consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth of these allegations and denies them on that basis.  Blue Belt denies the remaining allegations of Paragraph 25 of the FAC.

26.     Paragraph 26 of the FAC purports to quote studies allegedly relied upon by Blue Belt without identifying those studies; consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to these allegations and denies them on that basis. Paragraph 26 of the FAC purports to discuss studies concerning "error data for MAKO's products" without identifying those studies; consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to these allegations and denies them on that basis.  Blue Belt denies the remaining allegations of Paragraph 26 of the FAC.

27.     Paragraph 27 of the FAC purports to quote studies allegedly conducted by Blue Belt without identifying those studies; consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to these allegations and denies them on that basis. Blue Belt denies the remaining allegations of Paragraph 27 of the FAC.

28.     Blue Belt admits that initial CT or MRI scans are not required for use of the NavioPFS® for unicondylar knee arthroplasty.  Paragraph 28 of the FAC purports to quote papers allegedly released by Blue Belt without identifying those papers; consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to these allegations and

denies them on that basis.  Blue Belt denies the remaining allegations of Paragraph 28 of the FAC.

29.     Paragraph 29 of the FAC purports to quote presentations and representations allegedly made by Blue Belt without identifying those presentations and representations; consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to these allegations and denies them on that basis.  Paragraph 29 of the FAC purports to discuss studies concerning "the MAKO platform" without identifying those studies; consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to these allegations and denies them on that basis.  Blue Belt denies the remaining allegations of Paragraph 29 of the FAC.

30.     Paragraph 30 of the FAC purports to quote presentations and representations allegedly made by Blue Belt without identifying those presentations and representations; consequently, Blue Belt lacks knowledge or information sufficient to form a belief about the truth as to these allegations and denies them on that basis.  Blue Belt denies the remaining allegations of Paragraph 30 of the FAC.

31.     Blue Belt denies the allegations of Paragraph 31 of the FAC.

32.     Blue Belt denies the allegations of Paragraph 32 of the FAC.

33.     Blue Belt admits that it is a competitor of Mako, at least because the parties each advertise and sell a product or service generally described as surgical equipment.  Blue Belt denies the remaining allegations of Paragraph 33 of the FAC.

34.     Blue Belt admits that its attorneys received a letter from Mako dated June 18, 2014 purporting to demand "that Blue Belt cease and desist all advertisements in which Blue Belt makes false and/or misleading statements about the quality of MAKO's products," though Blue

7

Belt denies that Mako was justified in making any such demand or is entitled to any relief relating to such a demand.  Blue Belt denies the remaining allegations of Paragraph 34 of the FAC.

35.     Blue Belt admits that on July 16, 2014 Blue Belt issued a statement to its sales representatives, which could be shared with customers or prospective customers, asserting that Mako has engaged in "unfair business practices" that are "designed to increase Blue Belt's costs and force Blue Belt to raise its retail prices and undermine Blue Belt's position in the market" and that MAKO has engaged in a "campaign of false advertising and unfair competition directed at Blue Belt's customers and investors, including direct interference with Blue Belt's business and employment relationships."  Except as expressly admitted, Blue Belt denies the allegations of Paragraph 35 of the FAC.

36.     Blue Belt admits that in its July 16, 2014 statement, Blue Belt noted how the NavioPFS® "consistently beats Mako's product in fair competition for sales"; that "[r]ather than competing against Blue Belt lawfully on price or through product differentiation Mako has undertaken a national campaign of unfairly competitive tactics with the intention of destabilizing Blue Belt's business, reducing its value, and forcing Blue Belt to raise its prices to supracompetitive levels, all to the detriment of UKR patients, healthcare providers and payers"; and that all these efforts also are "negatively impacting our industry as a whole."  Except as expressly admitted, Blue Belt denies the allegations of Paragraph 36 of the FAC.

### AS TO "THE ASSERTED PATENT"

37.     Blue Belt admits that U.S. Patent No. 7,346,417 (the "'417 patent") is entitled "Method and Device System for Removing Material or for Working Material," and on its face indicates that the USPTO issued it on March 18, 2008.  Blue Belt lacks knowledge or information

sufficient to form a belief about the truth as to the remaining allegations of Paragraph 37 of the FAC, and denies these allegations on this basis.

38.     Blue Belt lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 38 of the FAC, and denies them on that basis.

## AS TO "COUNT I – INFRINGEMENT OF THE '417 PATENT"

39.     Blue Belt incorporates its responses to and denials of the allegations contained in Paragraphs 1 through 38 of the FAC, as if fully set forth herein.

40.     Blue Belt denies the allegations of Paragraph 40 of the FAC.

41.     Blue Belt states that on May 29, 2014 it received a letter on Morrison & Foerster stationary alleging infringement of the '417 patent and attaching the patent, but Blue Belt denies that it infringes the '417 patent; on that basis, Blue Belt denies the allegations of Paragraph 41 of the FAC.

42.     Blue Belt denies the allegations of Paragraph 42 of the FAC.

## AS TO "COUNT II – INDIRECT INFRINGEMENT OF THE '417 PATENT"

43.     Blue Belt incorporates its responses to and denials of the allegations contained in Paragraphs 1 through 42 of the FAC, as if fully set forth herein.

44.     Blue Belt denies the allegations of Paragraph 44 of the FAC.

45.     Blue Belt denies the allegations of Paragraph 45 of the FAC.

46.     Blue Belt denies the allegations of Paragraph 46 of the FAC.

47.     Blue Belt denies the allegations of Paragraph 47 of the FAC.

## AS TO "COUNT III – FALSE ADVERTISING"

48.     Blue Belt incorporates its responses to and denials of the allegations contained in Paragraphs 1 through 47 of the FAC, as if fully set forth herein.

49.     Blue Belt denies the allegations of Paragraph 49 of the FAC.

50.     Blue Belt denies the allegations of Paragraph 50 of the FAC.

51.     Blue Belt denies the allegations of Paragraph 51 of the FAC.

52.     Blue Belt admits that the NavioPFS® system has been sold to customers in the United States.  Blue Belt denies the remaining allegations of Paragraph 52 of the FAC.

53.     Blue Belt denies the allegations of Paragraph 53 of the FAC.

54.     Blue Belt denies the allegations of Paragraph 54 of the FAC.

**AS TO "COUNT IV – MISLEADING ADVERTISING"**

55.     Blue Belt incorporates its responses to and denials of the allegations contained in Paragraphs 1 through 54 of the FAC, as if set forth herein.

56.     Blue Belt denies the allegations of Paragraph 56 of the FAC.

57.     Blue Belt denies the allegations of Paragraph 57 of the FAC.

58.     Blue Belt denies the allegations of Paragraph 58 of the FAC.

59.     Blue Belt denies the allegations of Paragraph 59 of the FAC.

60.     Blue Belt denies the allegations of Paragraph 60 of the FAC.

61.     Blue Belt denies the allegations of Paragraph 61 of the FAC.

62.     Blue Belt admits that it is a competitor of Mako, at least because the parties each advertise and sell a product or service generally described as surgical equipment.  Except as expressly admitted, Blue Belt denies the allegations of Paragraph 62 of the FAC.

63.     Blue Belt denies the allegations of Paragraph 63 of the FAC.

**AS TO COUNT V – "DECEPTIVE AND UNFAIR TRADE PRACTICES"**

64.     Blue Belt incorporates its responses to and denials of the allegations contained in Paragraphs 1 through 63 of the FAC, as if set forth herein.

10

65.     Blue Belt denies the allegations of Paragraph 65 of the FAC.

66.     Blue Belt denies the allegations of Paragraph 66 of the FAC.

67.     Blue Belt denies the allegations of Paragraph 67 of the FAC.

68.     Blue Belt denies the allegations of Paragraph 68 of the FAC.

69.     Blue Belt denies the allegations of Paragraph 69 of the FAC.

## AS TO COUNT VI – "COMMON LAW UNFAIR COMPETITION"

70.     Blue Belt incorporates its responses to and denials of the allegations contained in Paragraphs 1 through 69 of the FAC, as if set forth herein.

71.     Blue Belt admits that it is a competitor of Mako, at least because the parties each advertise and sell a product or service generally described as surgical equipment, at times to the same prospective customers.  Except as expressly admitted, Blue Belt denies the allegations of Paragraph 71 of the FAC.

72.     Blue Belt denies the allegations of Paragraph 72 of the FAC.

73.     Blue Belt denies the allegations of Paragraph 73 of the FAC.

74.     Blue Belt denies the allegations of Paragraph 74 of the FAC.

75.     Blue Belt denies the allegations of Paragraph 75 of the FAC.

76.     Blue Belt denies the allegations of Paragraph 76 of the FAC.

## AS TO COUNT VII – "COMMON-LAW TORTIOUS INTERFERENCE"

77.     Blue Belt incorporates its responses to and denials of the allegations contained in Paragraphs 1 through 76 of the FAC, as if set forth herein.

78.     Blue Belt denies the allegations of Paragraph 78 of the FAC.

79.     Blue Belt denies the allegations of Paragraph 79 of the FAC.

80.     Blue Belt denies the allegations of Paragraph 80 of the FAC.

81.    Blue Belt denies the allegations of Paragraph 81 of the FAC.

82.    Blue Belt denies any other allegation of the FAC that has not been otherwise specifically admitted or responded to.

## RESPONSE TO PLAINTIFFS' DEMAND FOR RELIEF

Blue Belt denies that Plaintiffs are entitled to any relief whatsoever, either legal or equitable, from Blue Belt or this Court.  Furthermore, Blue Belt denies that this is an exceptional case such that an award of attorney's fees to Plaintiffs or an award of enhanced damages to Plaintiffs is appropriate.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Blue Belt asserts the following separate and additional defenses, all of which are pled in the alternative, and none of which constitutes an admission that Blue Belt is in any way liable to Plaintiffs, that Plaintiffs have been or will be injured or damaged in any way, or that Plaintiffs are entitled to any relief whatsoever.

## FIRST AFFIRMATIVE DEFENSE

Blue Belt has not infringed and does not directly infringe, literally or by application of the doctrine of equivalents, either willfully or otherwise, any claim of the '417 patent, nor does Blue Belt contribute to the infringement of, or actively induce others to infringe, either literally or by application of the doctrine of equivalents, any claim of the '417 patent.

## SECOND AFFIRMATIVE DEFENSE

The claims of the '417 patent are invalid, in whole or in part, for failing to meet the requirements for patentability under United States law, including, *inter alia*, 35 U.S.C. §§ 101, 102, 103, 112, 116, and 256, and the non-statutory doctrine of obviousness-type double-patenting.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs are estopped from asserting the claims of the '417 patent against Blue Belt by reason of, among other things, statements made in the '417 patent, amendments and/or statements made in and to the United States Patent and Trademark Office during the prosecution of the application that issued as the '417 patent, prior statements made in this or any other Court, prior rulings of this or any other Court, Plaintiffs' prior representations to foreign patent authorities and/or the courts of other nations, and/or other representations made by Plaintiffs.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs are not entitled to any injunctive relief because, *inter alia*, any alleged injury to Plaintiffs is not immediate or irreparable, and Plaintiffs have an adequate remedy at law for any alleged injury.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' FAC fails to state a claim upon which relief may be granted.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs are barred from asserting the claims of the '417 patent against Blue Belt by the equitable doctrine of patent misuse.

### SEVENTH AFFIRMATIVE DEFENSE

The '417 patent is unenforceable because individuals associated with prosecution of the patent committed inequitable conduct in its procurement.  Inventors of the '417 patent had a duty of candor and good faith in dealing with the USPTO, yet at least Tim Lüth, Jürgen Bier, and Andreas Hein withheld material prior art with an intent to deceive the USPTO.  But for that withholding of material prior art, the USPTO would not have issued the '417 patent.  Blue Belt

13

incorporates paragraphs 63 through 95 from Count III of its Counterclaims below, which provide the factual bases in support of the allegations of this defense, as if fully set forth herein.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiffs are estopped, in whole or in part, by the equitable doctrine of unclean hands, as Plaintiffs have engaged in the same kind of behavior they challenge.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in party, by reason of Plaintiffs' conduct and actions, which were made in bad faith.

**TENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Blue Belt's alleged advertisements, representations, presentations, or statements that are the subject of the claims are true and not false or materially misleading.

**ELEVENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred to the extent that Plaintiffs' alleged advertisements, presentations, or representations that are the subject of the claims consist of non-actionable statements of opinion or puffery.

**TWELFTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Blue Belt was justified and privileged in each and every alleged act Plaintiffs claim constitute tortious interference due to the privilege of fair competition, and other privileges and justifications. Blue Belt's alleged acts were not wrongful or intentionally designed to induce a breach or disruption of any contract or economic relationship and Blue Belt's state of mind was not malicious. The actions alleged in Plaintiffs' claims were at all times reasonable, privileged, and justified.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs are precluded from the recovery they seek from Blue Belt due to the lack of the necessary degree of scienter or intent on the part of Blue Belt, who has, at all times, acted in good faith and without malice.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to mitigate their damages, if any.

## RESERVATION OF RIGHT TO SUPPLEMENT DEFENSES

Blue Belt reserves its right to supplement its Answer with additional defenses that are learned in the course of discovery.

## JURY DEMAND

Blue Belt demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues presented by Plaintiffs' FAC that are so triable.

## BLUE BELT'S COUNTERCLAIMS AGAINST PLAINTIFFS

1.       Counterclaim-Plaintiff Blue Belt Technologies, Inc. ("Blue Belt") seeks a declaratory judgment that the U.S. Patent No. 7,346,417 (the "'417 patent") is not infringed by Blue Belt and is invalid and unenforceable.  Blue Belt also seeks damages for and an injunction against a course of unfair and deceptive trade practices and tortious interference with business relationships undertaken by Counterclaim-Defendant Mako Surgical Corp. ("Mako"), which is intended to undermine Blue Belt's developing position in the market for knee replacement surgery.  Blue Belt further seeks damages for and an injunction against Mako's past and continuing infringement of U.S. Patent Nos. 6,757,582 (the "'582 patent") and 6,205,411 (the "'411 patent").

**PARTIES**

2.      Blue Belt is a corporation organized and existing under the laws of the State of Pennsylvania, with a principal place of business at 2905 Northwest Boulevard, Suite 40, Plymouth, Minnesota 55441.

3.      Upon information and belief, Mako is a corporation organized and existing under the laws of Delaware, and Mako maintains its principal place of business at 2555 Davie Road, Fort Lauderdale, Florida 33317.

4.      Upon information and belief, Counterclaim-Defendant All-of-Innovation GmbH ("AOI") is a corporation organized and existing under the laws of Germany, and AOI maintains its principal place of business at Gleissenweg 1, Ismaning, Bayern 85737, Germany.

**JURISDICTION**

5.      This Court has subject matter jurisdiction for the declaratory relief portion of Blue Belt's counterclaims under 28 U.S.C. §§ 2201 and 2202.

6.      This Court further has subject matter jurisdiction over Blue Belt's counterclaims under 28 U.S.C. §§ 1331, 1332(a), and 1338.

7.      This Court further has subject matter jurisdiction over Blue Belt's counterclaims arising under state law pursuant to 28 U.S.C. § 1367, because Blue Belt's state law claims are ancillary and/or pendant to Blue Belt's federal claims, and therefore supplementary jurisdiction is appropriate over such state law claims.

8.      The Court has personal jurisdiction over Mako because Mako made a general appearance in this case and maintains its headquarters in Florida.

9.      The Court has personal jurisdiction over AOI because AOI made a general appearance in this case.

16

10.     Venue is proper for Blue Belt's counterclaims under 28 U.S.C. §§ 1391 and 1400.

**BACKGROUND**

**Blue Belt's NavioPFS® System**

11.     Counterclaim-Plaintiff Blue Belt has developed revolutionary new technology in the field of orthopedic surgery, and is a recent entrant into that market.

12.     Blue Belt was founded in 2004 to provide a vehicle for the commercialization and public adoption of exciting new advances in robotics-assisted surgery being developed at the Robotics Institute at Carnegie Mellon University in Pittsburgh, Pennsylvania ("CMU").

13.     In November 2012, Blue Belt was approved by the United States Food and Drug Administration ("FDA") to market in the United States Blue Belt's NavioPFS® surgical system for Unicondylar Knee Replacement ("UKR," also known as partial knee replacement).

14.     Traditional UKR surgery is performed using manual instruments and is prone to human error, which can lead to inconsistent results and high revision and retreatment rates.  The NavioPFS® surgical system, by contrast, combines a planning and navigation platform that presents to the surgeon a virtual cutting guide with detailed visualization and an intelligent hand-held instrument which enables the precision of robotics in the hand of the surgeon.

15.     To bring the NavioPFS® to market, Blue Belt leveraged many years of ground-breaking research and development that began at CMU and continued at Blue Belt after its founding.  The result provides a uniquely efficient, open-architecture platform that allows for multiple supported implant systems and that costs approximately two-thirds less than Counterclaim-Defendant Mako's proprietary system, the RIO Robotic Arm Interactive Orthopedic device.

17

16.     In 2012, Blue Belt's NavioPFS® system was awarded the Frost & Sullivan Global Orthopedic Surgery Technology Innovation Award, earning the NavioPFS® praise for its "potential to alter the way the industry looks at knee replacements and other applications where precise bone shaping is critical."

## Mako's RIO System

17.     Today, robotics-assisted UKRs comprise approximately 10-15 percent of all UKRs performed in the United States annually, and that percentage is growing as healthcare providers increasingly seek to apply modern technology to address patients' and payers' heightened demand for reliable, safe, and cost-effective knee replacement.

18.     Prior to the FDA's approval of the Blue Belt NavioPFS® surgical system, Mako's RIO system was the only publicly available, FDA-approved robotics-assisted UKR system available for purchase and permanent installation in the United States.

19.     Mako's RIO system relies on computed tomography ("C-T") scans to map a desired path for the surgeon's hand-held cutting apparatus, which provides haptic sensory feedback to the surgeon when movements deviate from the desired path.

## Superiority of Blue Belt's New Technology

20.     On information and belief, the list price for a new RIO system exceeds $1 million, not including service costs, which on information and belief can add $100,000 or more annually to the cost of owning a RIO system.

21.     New NavioPFS® systems are available for less than $400,000, with an optional service agreement that costs less than $40,000 annually.

22.     Blue Belt's own patented technology, which does not infringe any of Mako's patents or patents licensed by Mako for its RIO system, allows Blue Belt to deliver comparable or better performance at a drastically more affordable price point.

23.     Blue Belt's innovation, cost-effective methods, and competitive pricing have allowed healthcare providers to help many patients.   Since 2012, Blue Belt has sold approximately 20 NavioPFS® systems in the United States, to hospitals, private practitioners, and ambulatory surgery centers ("ASCs"), and has received uniformly positive reviews for the NavioPFS® system's accuracy, reliability, and cost-effectiveness.

24.     Blue Belt has beaten Mako in fair competition for sales in the United States.  In at least nine confirmed instances where prospective buyers were considering both NavioPFS® and RIO, the buyer selected Blue Belt's product and completed the purchase.

25.     Blue Belt's burgeoning success has not gone unnoticed by Mako and by AOI. Indeed, both Counterclaim-Defendants know that consumers, given the choice between Mako's and Blue Belt's systems, will favor the more cost-effective option.  But rather than competing against Blue Belt lawfully on price or through product differentiation, Mako has undertaken a national campaign of unlawful tactics with the intention of destabilizing Blue Belt's business, imposing remedial costs on Blue Belt, and unfairly forcing Blue Belt to raise its prices, all to the detriment of healthcare providers and patients throughout the United States.

### Mako's and AOI's Sham Patent Claims in the Florida Action

26.     Mako has licensed, among other intellectual property, the '417 patent, which is entitled "Method and device system for removing material or for working material."

27.     On information and belief, Mako's license to the '417 patent imposes a production cost on Mako that Blue Belt does not, and need not, face.  On information and belief, Mako and

AOI believe that imposing the costs of licensing the '417 patent on Blue Belt will force Blue Belt to raise its prices.

28.     AOI and Mako have asserted the '417 patent against Blue Belt and the NavioPFS® in this action, No. 1:14-cv-61263-DPG/WCT (S.D. Fla.) (the "Florida Action").  In the Florida Action, AOI and Mako purport to seek damages and an injunction in connection with Blue Belt's alleged infringement.

29.     On information and belief, Mako and AOI know that Blue Belt does not practice any valid claims of the '417 patent in connection with the NavioPFS® system. Therefore, Counterclaim-Defendants' claims for damages and an injunction are an unlawful attempt to leverage the patent system in order to raise Blue Belt's costs and, eventually, its retail prices.

30.     Mako and AOI's claims against Blue Belt in the Florida Action are a sham: their claims of patent infringement are objectively baseless, and on information and belief they have filed those claims with the subjective intent to inflict unlawful injury on Blue Belt, including by exerting undue pressure on Blue Belt to raise the prices of the NavioPFS® and related products to account for costs that Blue Belt legally should not have to bear.

31.     On or about March 14, 2014, at a conference of the American Academy of Orthopedic Surgeons in New Orleans, a Mako senior executive met with a consultant to Blue Belt who has a relationship with Blue Belt's upper-level management. Mako's senior executive told Blue Belt's consultant that Mako believes that Blue Belt is undermining Mako's sales of capital equipment by making it harder for Mako to consummate sales of the RIO system at its current prices. On information and belief, the Mako senior executive conveyed to Blue Belt's consultant that Blue Belt was impairing Mako's ability to charge elevated prices for installed UKR systems.

The Mako senior executive then told Blue Belt's consultant that Mako would not pursue the Florida Action or other legal action if Blue Belt agreed to raise its prices.

32.     On information and belief, Mako intended by this interaction to secure Blue Belt's agreement to raise its own prices to an unfairly elevated level, even higher than the level at which Blue Belt would need to price its products if it were deemed to owe Mako and AOI a reasonable royalty on the '417 patent (which Blue Belt denies it owes, as Blue Belt does not practice the '417 patent and thus has no obligation to pay any royalty for it).  Blue Belt refused to entertain Mako's proposal.

33.     On information and belief, AOI has authorized and approved of Mako's assertion of baseless claims of the '417 patent as part of Mako's unfair and unlawful tactics.

### Mako's Other Unlawful Actions

34.     Separately and in addition to its abuse of the patent laws in the Florida Action, Mako has unlawfully attempted to further interfere with Blue Belt's business in other ways.

35.     On information and belief, Mako has sought to collude with owners of other intellectual property, in order to impose further illegitimate costs on Blue Belt's business.  On or between June 5 and June 7, 2014, a representative of Stryker Corporation ("Stryker"), Mako's parent corporation, approached an employee from Think Surgical (formerly known as Curexo), the maker of the ROBODOC Surgical System for, among other things, Total Hip Arthroplasty ("THA").  The Stryker representative proposed that Think Surgical join the Florida Action as a plaintiff to assert against Blue Belt certain patents already licensed by Mako.

36.     Mako has engaged in unfair competition in order to stunt Blue Belt's progress with key healthcare providers.  For example, at the Community Regional Medical Center in Fresno,

California, Mako sales representatives offered to provide practitioners with a free RIO system, on the condition that they uninstall their NavioPFS® system.

37.     On information and belief, Mako is pursuing a nationwide plan to "swap out" NavioPFS® systems, at a loss, in order to prevent Blue Belt from obtaining a critical mass of practitioners who use the NavioPFS®.  On information and belief, Mako has pursued these "swap out" at, *inter alia*, Community Regional Medical Center in Fresno, California.  On information and belief, Mako is pursuing this plan in order to prevent Blue Belt from obtaining further market credibility for NavioPFS® and to prevent Blue Belt from obtaining further data regarding the efficacy of NavioPFS® in the field, as Mako knows that such data would result from surgeons' use of NavioPFS® and would further demonstrate that NavioPFS® is just as effective as Mako's RIO system but at approximately one-third the cost.

38.     On information and belief, in addition to such "swap out" activities, Mako is pursuing a nationwide plan to sell or give away its RIO system for free or below cost to its customers in return for those customers executing exclusive sales contracts with Mako and/or its corporate parent, Stryker.

## Mako's False Statements to the Marketplace

39.     As part of its campaign to dislodge Blue Belt's growing foothold with surgeons and hospitals, Mako has resorted to a variety of unlawful, false, and misleading statements. Among other things, Mako and its agents have falsely stated to current and prospective Blue Belt customers that: Blue Belt infringes on Mako's intellectual property; Blue Belt was forced to recall all of its NavioPFS® systems because of safety malfunctions; pending legal actions will require customers to cease using their NavioPFS® systems; Blue Belt requires NavioPFS® users to also use Blue Belt's implants; the NavioPFS® system is not actually robotic; the NavioPFS® system

is incompatible with burs larger than four millimeters; the NavioPFS® system cannot be used to perform lateral UKR procedures; certain customers were returning their NavioPFS® systems and/or abandoning their use; and Blue Belt will soon be forced to discontinue sales of the NavioPFS® system entirely.   Each and every one of these statements by Mako and its representatives is false and misleading.

40.    For example, in 2013, one or more Mako representatives made false, misleading, and deceptive statements about Blue Belt to employees of St. Francis Memorial hospital in Francisco ("St. Francis Memorial"), a prospective Blue Belt customer. Mako tried to convince St. Francis Memorial staff that one or more of Blue Belt's products were not lawfully commercialized because they allegedly lacked clinical data, resulted in long case durations, and did not contain certain features.  These statements were false and misleading.

41.    In mid- to late-2013, one or more Mako representatives spoke with employees of McBride Orthopedic Hospital in Oklahoma City ("McBride") and made false, deceptive, and misleading statements meant to convince McBride to use Mako's products instead of Blue Belt's products.  These statements included false suggestions that Blue Belt's technology was not "proven," that NavioPFS® infringes on Mako's intellectual property, and that Blue Belt would soon be forced to discontinue the NavioPFS® system and support for it.

42.    In late 2013, one or more Mako representatives contacted employees of Valley Baptist Medical Center in Brownsville, Texas ("Valley Baptist") and made false, misleading, and deceptive statements about the NavioPFS® system in order to convince Valley Baptist to use Mako products instead.  Mako representatives falsely suggested that NavioPFS® was unproven and that the system could not do what comparable Mako products can do.

43.     In or between March and May of 2014, Mako representatives made false, misleading, and deceptive statements about the NavioPFS® system to an orthopedic surgeon in or around Fremont, California.  Mako representatives falsely stated that a four-millimeter bur is the largest bur the NavioPFS® system can utilize, that the NavioPFS® system cannot be used to perform lateral UKR surgeries, and that St. Francis Memorial was returning its NavioPFS® system and discontinuing use of it in the meantime.

44.     In early June 2014, representatives of Mako and/or Stryker contacted a physician at Southcoast Physicians Group ("Southcoast") and made false, deceptive, and misleading statements about Blue Belt and its products.  The Mako and/or Stryker representatives falsely stated that this physician could no longer use his NavioPFS® system because of a recent alleged recall and because of the Florida Action against Blue Belt, and that Blue Belt would soon be put out of business by intellectual property lawsuits, including the Florida Action.

45.     On or about June 5, 2014, representatives of Mako and/or Stryker, including at least Bill Peters, made false, deceptive, and misleading statements to doctors and other potential customers associated with the Southeast Alabama Medical Center ("SAMC").  The Mako and/or Stryker representatives, including Mr. Peters, falsely and misleadingly stated that the NavioPFS® is "not a robotic system," that the NavioPFS® "was recalled last week due to failures in surgery," including a "clinical failure to keep the bur[] in the field," and that Blue Belt "also [has] another major problem, St[r]yker just filed a lawsuit because they [Blue Belt] stole IP and they are making false claims about being a robotic system."  The Mako and/or Stryker representatives also falsely accused Blue Belt of requiring surgeons to use Blue Belt's implants with the system.  The representatives also falsely claimed that Blue Belt would "most likely be put out of business."

24

46.     Mako's tactics have had, and continue to have, a direct and substantial impact on Blue Belt's business operations, including its ability to consummate sales and maintain business relationships.  For example, Mako's false and misleading statements to SAMC representatives threaten to unfairly affect the outcome of Mako and Blue Belt's direct competition to sell and install a robotics-assisted UKR system at SAMC.

47.     Mako's campaign of false, deceptive, and misleading statements also includes tactics that amount to interference with Blue Belt's employment contracts.  On June 2, 2014, a Mako representative named Andrew Whetsel contacted Andrew Camp, Blue Belt's Regional Manager for the Northeast, and used false, deceptive, and misleading statements about Blue Belt to try to convince Mr. Camp to quit Blue Belt and begin working for Mako.  Mr. Whetsel falsely stated that Blue Belt was in trouble in light of the Florida Action—which Mako had filed the previous business day.  Mr. Whetsel also asked for contact information for Blue Belt's employees in New York and New Jersey, in an attempt to contact these employees, mislead them regarding Blue Belt, and convince them to quit Blue Belt and join Mako.

48.     Mako apparently has no intention of discontinuing its unlawful campaign against Blue Belt.  On June 20, 2014, attorneys for Blue Belt sent attorneys for Mako a letter detailing eight instances of unlawful Mako practices actionable under federal and state law and demanding that Mako immediately: "cease and desist from making false or misleading statements in the market about Blue Belt, . . . cease and desist from its other unfair and unlawful actions harming Blue Belt . . . [and] cease and desist from efforts to interfere with the valid business and contractual relationships Blue Belt has with its customers, prospective customers and employees." Mako responded to Blue Belt's letter on July 1, 2014, but refused to address the substance of Blue Belt's letter, instead claiming only that it would "investigat[e]" Blue Belt's grievances.  Although

Mako claimed to take Blue Belt's allegations "seriously," Mako would not commit to refrain from further improper conduct.

### Blue Belt's '582 Patent

49.     Blue Belt's growing success arises from its ability to cost-effectively leverage years of groundbreaking research that began at the Robotics Institute at CMU and continued after Blue Belt's spinoff.  One critical aspect of that research is U.S. Patent No. 6,757,582 (the "'582 patent"), entitled "Methods and Systems to Control a Shaping Tool," which issued to CMU on June 29, 2004 and which is directed to the process of controlling cutting tools to obtain a target shape.  The NavioPFS® practices claims of the '582 patent.

50.     Mako's RIO system infringes claims of the '582 patent.  Mako does not have a license to practice the '582 patent.

51.     Thus, in contrast to Mako's sham assertion of the '417 patent against Blue Belt, Blue Belt has a legitimate claim of patent infringement against Mako.  Blue Belt therefore brings a counterclaim for patent infringement in this action, in the interest of resolving both Blue Belt's and Mako's and AOI's claims in the same forum and at the same time, so that Blue Belt can return to focusing its energies on providing innovation and providing efficient, effective surgical tools in the UKR market.

### Blue Belt's '411 Patent

52.     Blue Belt's growing success arises from its ability to cost-effectively leverage years of groundbreaking research that began at the Robotics Institute at CMU and continued after Blue Belt's spinoff.  Additional critical aspects of the groundbreaking research that began at CMU and has continued at Blue Belt are the subject of U.S. Patent No. U.S. Patent No. 6,205,411 (the "'411 patent").  The '411 patent, entitled "Computer-Assisted Surgery Planner and Intra-

Operative Guidance System," issued to CMU on March 20, 2001. The NavioPFS® practices claims the '411 patent.

53.     Mako's RIO system infringes claims of the '411 patent. Mako does not have a license to practice the '411 patent.

54.     Thus, in contrast to Mako's sham assertion of the '417 patent against Blue Belt, Blue Belt has a legitimate claim of patent infringement against Mako. Blue Belt therefore brings an additional counterclaim for patent infringement in this action, in the interest of resolving both Blue Belt's and Mako's and AOI's claims in the same forum and at the same time, so that Blue Belt can return to focusing its energies on providing innovation and providing efficient, effective surgical tools in the UKR market.

**COUNT I**

**DECLARATORY JUDGMENT OF INVALIDITY (28 U.S.C. § 2201)**

55.     Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 54 as if set forth fully herein.

56.     There is an actual, live controversy between Blue Belt and Counterclaim-Defendants as to whether the '417 patent is valid. Specifically, Blue Belt contends that the '417 patent is invalid, whereas Counterclaim-Defendants contend that it is valid.

57.     The claims of the '417 patent are invalid for failure to comply with the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, 112, 116, and 256 and/or the non-statutory doctrine of obviousness-type double-patenting, because, *inter alia*, the specification fails to enable or describe the full scope of the issued claims, and/or the claims are anticipated and/or rendered obvious by the prior art.

58.    Blue Belt therefore seeks a declaration that each of the claims of the '417 patent is invalid.

## COUNT II

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT (28 U.S.C. § 2201)

59.    Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 58 as if set forth fully herein.

60.    There is an actual, live controversy between Blue Belt and Counterclaim-Defendants as to whether Blue Belt has infringed or does infringe, directly or indirectly, any valid claim of the '417 patent.

61.    Any use, manufacture, offer for sale, sale, and/or importation into the United States of NavioPFS® by Blue Belt does not directly or indirectly infringe any claim of the '417 patent, literally or under the doctrine of equivalents.

62.    Blue Belt therefore seeks a declaration that it has not and does not infringe any claim of the '417 patent, directly or indirectly, either literally or under the doctrine of equivalents.

## COUNT III

### DECLARATORY JUDGMENT OF UNENFORCEABILITY

63.    Blue Belt repeats and re-alleges the allegations of paragraphs 1-62, as if set forth fully herein.

64.    The claims of the '417 patent—and thus Plaintiffs' claims thereunder—are unenforceable due to inequitable conduct.

65.    During prosecution of the '417 patent, individuals associated with prosecution of the patent breached their duty of candor and good faith in dealing with the USPTO by withholding material, non-cumulative prior art from the patent examiner with intent to deceive the

USPTO.  This material prior art included a printed publication authored by named inventors of the '417 patent.

66.     The '417 patent states on its face that it issued from U.S. Patent Application No. 10/472,654, purportedly a national stage application of PCT No. PCT/EP02/03334 filed on March 25, 2002.  The '417 patent purports to claim priority to three German applications filed in March and April of 2001.

67.     Almost three years before the filing of the German applications to which the '417 patent purports to claim priority, Tim Lüth, Jürgen Bier, and Andreas Hein, three of the five named inventors on the '417 patent, co-authored (with others) a publication entitled "A Surgical Robot System for Maxillofacial Surgery," ("Surgical Robot").

68.     Surgical Robot was published in 1998 in the Institute of Electrical and Electronics Engineers' *Industrial Electronics Society*, IECON '98, Proceedings of the 24th Annual Conference of the IEEE, Vol. 4, Meeting Date Aug. 31 to Sept. 4, 1998.  Surgical Robot is prior art to the '417 patent under at least 35 U.S.C. §§ 102(a), 102(b), and 103.

69.     Surgical Robot discloses each element of at least one claim of the '417 patent, and is therefore material to the patentability of the '417 patent.  Moreover, Surgical Robot is material to patentability because it discloses the very subject matter that the applicants for the '417 patent argued to the USPTO rendered the then-pending claims in the application for the '417 patent novel and non-obvious over the prior art.

70.     Surgical Robot is not cumulative of the prior art that was disclosed to and before the patent examiner during prosecution of the '417 patent.

71.     The persons involved in prosecution of the '417 patent, including at least Tim Lüth, Jürgen Bier, Andreas Hein, the other named inventors, and prosecution counsel, did not

disclose Surgical Robot to the USPTO in connection with the prosecution of the '417 patent. Surgical Robot is not disclosed anywhere on the face of the '417 patent, in its prosecution history, or in the international application that preceded the application at the USPTO.

72.     On information and belief, the examiner of the '417 patent was not aware of Surgical Robot.  Had the examiner been aware of Surgical Robot, the examiner would have rejected the claims of the '417 patent and would not have allowed them to issue, because Surgical Robot discloses each and every limitation of the claims of the '417 patent, and renders those claims obvious.

73.     The USPTO would not have allowed any of the claims of the '417 patent to issue but for the failure of Messrs. Lüth, Bier, and Hein to disclose Surgical Robot.

74.     For example, with respect to Claim 1 of the '417 patent, Surgical Robot discloses a method for removing and processing material with at least one effector, wherein the effector defines a volume and has a predetermined geometry, and such method comprises removing and processing material from an object with the effector by ***manually guiding the effector in relation to the object***, determining, using a navigation system, position and orientation of the effector in relation to at least one reference body as the effector removes material from the object, storing data representative of the position and orientation of the effector in relation to the body as the effector removes the material from the object, supplying at least one of power and parameterization control commands to the effector as a function of at least one of a predetermined work volume for the object, volume of the material removed from the object and volume of residual material in the work volume, and wherein the removed material volume and residual material value are determined based on the volume and geometry of the effector and the position

and orientation of the effector data.  Had the examiner been aware of Surgical Robot, the examiner would have rejected Claim 1 under 35 U.S.C. §§ 102 and 103.

75.     On information and belief, individuals associated with prosecution of the '417 patent, including at least named inventors Tim Lüth, Jürgen Bier, and Andreas Hein, withheld Surgical Robot from the examiner of the application for the '417 patent, with intent to deceive the USPTO.

76.     Mr. Lüth, Mr. Bier, and Mr. Hein were co-authors of Surgical Robot, and therefore knew about Surgical Robot, and the information disclosed therein.  Indeed, on information and belief, Messrs. Lüth, Bier, and Hein were intimately familiar with the disclosures of Surgical Robot regarding a surgical robot system, and knew that it was prior art to, and disclosed the limitations of the claims of, the application for the '417 patent.

77.     Yet not one of those three named inventors disclosed Surgical Robot to the examiner of the '417 patent, or to the EPO, prior to submitting the application to the USPTO, or at any point during the prosecution of the '417 patent.

78.      On information and belief, Messrs. Lüth, Bier, and Hein withheld Surgical Robot from the examiner of the '417 patent with intent to deceive the USPTO.

79.     On information and belief, Messrs. Lüth, Bier, and Hein each knew that, had the examiner been aware of Surgical Robot, the examiner would have rejected the claims of the application for the '417 patent and prevented those claims from issuing.

80.     For example, the examiner of the '417 patent rejected all claims as being obvious over U.S. Patent No. 5,408,409 ("the '409 Patent"),[1] explaining that the '409 Patent discloses or renders obvious all limitations of the claims of the application for the '417 patent.  *See* U.S Patent Application 10/472,654, Office Action dated Nov. 8, 2006.

81.     In response, the patent applicants amended the claims "directed to a method for removing and processing material" to require "*in relevant* part, the step of 'manually guiding the effector in relation to the object.'"   U.S. Patent Application 10/472,654, Amendment and Response dated March 6, 2007, at 18 (emphasis added).

82.     Those individuals involved in the patent procurement, including Messrs. Lüth, Bier, and Hein, represented to the examiner that the amendments describing an effector being "manually guided to remove the desired volume of material" overcame "[e]xpensive mechanical assemblies [such as cutting robots] for guiding' the effector as existed in prior art systems," including for example, in the '409 Patent.  *Id*.

83.     The explanation for the amendment continues that "[i]n contrast to the invention of claim 58, [the '409 Patent] concerns robotic (automated) control of the position of a surgical tool during a surgery," and a "robotically controlled tool" completes the surgery and automatically withdraws and turns off.  *Id*.

84.     The applicants further claimed that "[n]owhere does [the '409 Patent] teach or suggest manually guiding an effector to remove material from an object, in the absence of robotic control of the positioning of the effector while the effector is removing material."  *Id*. at 17-18.

_____

[1]   Two claims (claims "70" and "71") were rejected for depending on a cancelled claim, but had their dependency been properly written, they would have been subject to the same obviousness rejection.

32

85.     Thus, the inventors represented that the notion of manually guiding the effector was not present in the fully automated robot disclosed in the '409 Patent, and with the addition of such limitation through the amendments to the independent claims—from which all of the remaining claims depended—the claims presented overcame the prior art.

86.     Based on the representations as to the prior art's missing limitations, and the amendments made, the examiner allowed the '417 patent to issue. *See* U.S Patent Application 10/472,654, Notice of Allowance, dated May 11, 2006.   Thus, following the addition of "manually guiding the effector in relation to the object" to issued claim 1 (previously 58), and at least one effector "to be manually guided in relation to an object" to issued claim 40 (previously 97), the two independent claims, the examiner allowed those claims—and the remaining claims depending therefrom—to issue. *Id*.

87.     On information and belief, had the examiner been informed about Surgical Robot, the examiner would have rejected the claims of the '417 patent over Surgical Robot (alone or in combination with other prior art).

88.     Surgical Robot, for example, discloses the limitation of "manually guiding the effector in relation to the object"[2], which the patentee argued was missing from the '409 Patent. For example, Surgical Robot discloses a method of using a surgical tool wherein a surgeon takes hold of a handpiece and "[t]he surgeon corrects the position and orientation" of the surgical tool. *See* **Exhibit D** (Surgical Robot), at 2474.

---

[2]     This is the relevant amendment to claim 58; or as amended in then claim 97, "at least one effector . . . operable to be manually guided in relation to an object."

33

89.     Surgical Robot further discloses that the surgical tool is has an "*Intelligent-Medical-Instrument-Support* mode in which a medical instrument is mounted on the robot and can be moved interactively by surgeon and robot." *Id*. at 2472.

90.     And Surgical Robot further describes an "NPR mode, [where] the surgeon moves the robot by grasping the robot mounted hand piece from position O, to *the contact location* C1." *Id.* at 2474 (emphasis in original).

91.     Finally, Surgical Robot discloses that "[s]tarting from the contact location the surgeon can drill into the bone with free control along the z-axis…." *Id.* at 2474.

92.     Thus, by withholding Surgical Robot from the examiner, Messrs. Lüth, Bier, and Hein, deceived the examiner into allowing claims that should not have been allowed, and deceived the USPTO into issuing the '417 patent.

93.     On information and belief, Messrs. Lüth, Bier, and Hein withheld Surgical Robot with intent to so deceive the examiner and the USPTO, and with knowledge that Surgical Robot was material, non-cumulative prior art to their patent application.

94.      Because of the inequitable conduct committed by at least Messrs. Lüth, Bier, and Hein, the '417 patent is unenforceable, and Plaintiffs may not obtain any relief regarding it.

95.     Blue Belt therefore seeks a declaration that the '417 patent is unenforceable.

## COUNT IV

## FALSE ADVERTISING (15 U.S.C. § 1125(a))

96.     Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 95 as if set forth fully herein.

97.     Blue Belt is a competitor of Mako, at least because the parties each advertise and sell a product or service generally described as surgical equipment and technology in interstate commerce.

98.     Mako has falsely advertised on at least one occasion that, among other things: (i) consumers can no longer use Blue Belt's NavioPFS® system because of a safety recall; (ii) Blue Belt infringes on Mako's intellectual property and will soon no longer be in business; (iii) the NavioPFS® system requires surgeons to use Blue Belt's proprietary implants; (iv) the NavioPFS® system lacks clinical data sufficient to justify its claimed results; (v) the NavioPFS® system lacks certain features; and (vi) Blue Belt stole intellectual property from Mako.

99.     Mako's false advertisements were made in bad faith, deceived or had the capacity to deceive consumers, and had a material effect on consumer purchasing decisions affecting interstate commerce.

100.    As a result of Mako's deceptive advertisements, Blue Belt has suffered damages in an amount to be determined at trial.

101.    Blue Belt is entitled to treble damages, as well as its attorneys' fees.

## COUNT V

## DECEPTIVE AND UNFAIR TRADE PRACTICES (Fla. Stat. 501.201, *et seq.*)

102.    Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 101 as if set forth fully herein.

103.    Mako has falsely and misleadingly stated on at least one occasion that, among other things: (i) consumers can no longer use Blue Belt's NavioPFS® system because of a safety recall; (ii) Blue Belt infringes on Mako's intellectual property and will soon no longer be in business; (iii) the NavioPFS® system requires surgeons to use Blue Belt's proprietary implants;

(iv) the NavioPFS® system lacks clinical data sufficient to justify its claimed results; (v) the NavioPFS® system lacks certain features; and (vi) Blue Belt stole intellectual property from Mako.

104.    By making these false and misleading statements, Mako has engaged in unfair and deceptive trade practices in a trade or commerce.

105.    Mako knew or should have known of the falsity and misleading nature of these statements, but, on information and belief, Mako nonetheless intended for the misrepresentations to induce others to rely and act on such false and misleading information.

106.    Mako's misrepresentations regarding Blue Belt and its products violate standards for fair competition imposed by state and federal law and have misled the consuming public to its detriment and to the detriment of Blue Belt's legitimate business enterprise.

107.    Further, as set forth herein and on information and belief, Mako has unfairly offered for sale, sold, and/or offered the use of the RIO system at a price below Mako's cost to produce the RIO system, such cost being based on Mako's fixed and variable costs related to the RIO system.

108.    On information and belief, Mako has unfairly given away the RIO system for free or has attempted to do so.

109.    On information and belief, Mako's purpose in selling, offering to sell, offering the use of, and/or giving away the RIO system was to influence, deceive, promote, or encourage the purchase of other products and services from Mako, including but not limited to Mako's orthopedic implants and technological supports services related to the RIO system.

110.    On information and belief, Mako's sales, offers to sell, offers to use, and/or giving away of the RIO system took business away from Blue Belt in the form of lost sales of the NavioPFS and related products and services.

111.    On information and belief, Mako's intent and purpose for the actions described herein was to unfairly injure competitors and destroy competition, including with the intent and purpose to injure Blue Belt, and further with the intent to deceive customers by later increasing prices significantly once the competition was diminished.

112.    As a result of Mako's actions described herein, and because Mako's RIO system is in direct competition with Blue Belt's NavioPFS, on information and belief Blue Belt was harmed in the form of lost sales of its NavioPFS system, as well as lost sales of orthopedic implants and support services made and/or sold by Blue Belt and its business partners.

113.    On information and belief, Mako's actions described herein were a substantial factor in causing the above-described harm to Blue Belt.  Had Mako not engaged in such actions, Blue Belt would have executed additional sales and service contracts for its NavioPFS system and related products and services.  Blue Belt has thus been aggrieved by the wrongful and intentional actions of Mako.  Such pattern of "unfair methods of competition", "unconscionable acts or practices," and "unfair or deceptive acts or practices in the conduct of any trade or commerce is in violation of Florida law."  Fla. Stat. § 501.204.

114.    As a proximate and direct result of Mako's acts, Blue Belt has suffered damages in an amount to be determined at trial.

115.    Further, as a proximate and direct result of Mako's acts, Blue Belt is entitled to injunctive relief to enjoin such conduct.

## COUNT VI

## COMMON-LAW UNFAIR COMPETITION

116.    Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 114 as if set forth fully herein.

117.    Mako has engaged in deceptive and fraudulent conduct by falsely and misleadingly stating on at least one occasion that, among other things: (i) consumers can no longer use Blue Belt's NavioPFS® system because of a safety recall; (ii) Blue Belt infringes on Mako's intellectual property and will soon no longer be in business; (iii) the NavioPFS® system requires surgeons to use Blue Belt's proprietary implants; (iv) the NavioPFS® system lacks clinical data sufficient to justify its claimed results; (v) the NavioPFS® system lacks certain features; and (vi) Blue Belt stole intellectual property from Mako.

118.    Mako knew or should have known of the falsity of these statements, but, on information and belief, Mako made these statements in bad faith and with malice or reckless indifference to the interests of Blue Belt and the market for robotic surgical tools for UKR, and with the intention of inducing others to rely and act on them, causing consumer confusion or giving rise to the likelihood of such confusion.

119.    As a result of Mako's acts, Blue Belt has suffered damages in an amount to be determined at trial.

## COUNT VII

## COMMON-LAW TORTIOUS INTERFERENCE

120.    Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 119 as if set forth fully herein.

121.    Mako has interfered with actual and/or prospective business relationships between Blue Belt and several other participants in the market for robotic surgical tools for UKR, their employees and agents, and related individuals, including but not limited to St. Francis Memorial, McBride, Valley Baptist, an orthopedic surgeon in California, Southcoast, SAMC, Andrew Camp, and other Blue Belt employees.

122.    At the time of each such interference, Mako knew of Blue Belt's actual or prospective business relationship with the target of that interference.

123.    Mako's intentional and unjustified interference with Blue Belt's business relationships has caused or threatened to cause one or more of Blue Belt's actual or potential customers or employees to refuse to deal with Blue Belt.

124.    As a direct and proximate result of Mako's interference, Blue Belt has suffered damages in an amount to be determined at trial.

## COUNT VIII

### DIRECT INFRINGEMENT OF THE '582 PATENT (35 U.S.C. § 271(a))

125.    Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 124 as if set forth fully herein.

126.    The '582 patent, entitled "Methods and Systems to Control a Shaping Tool," was duly and legally issued by the U.S. Patent and Trademark Office on June 29, 2004.  The '582 patent is assigned to Blue Belt. A true and correct copy of the '582 patent is attached as **Exhibit A**.

127.    All conditions precedent to the maintenance of Blue Belt's claim of patent infringement by Mako have occurred or been performed or have been waived.

39

128.    In violation of 35 U.S.C. § 271(a), Mako has infringed in the past and continues to directly infringe the '582 patent in this judicial district and elsewhere in the United States.  Mako has infringed and has continued to infringe through the manufacture, use, offer for sale, sale, and/or importation of products, associated software, and components, including, without limitation, the RIO Robotic Arm Interactive Orthopedic device, the Tactile Guidance System ("TGS"), and Restoris implants.

129.    Mako was aware of the existence of the '582 patent long before the filing of this counterclaim, having on multiple occasions prior to the initiation of this litigation inquired about licensing or offered to license the patent.  Nonetheless, Mako continues to manufacture, use, sell, offer to sell and/or import products, associated software, and components, including, without limitation, the RIO Robotic Arm Interactive Orthopedic device, the Tactile Guidance System ("TGS"), and Restoris implants in willful, intentional, and deliberate infringement of one or more of claims of the '582 patent.

130.    Mako's acts of infringement of the '582 patent have caused and will continue to cause Blue Belt substantial and irreparable injury, for which Blue Belt is entitled to receive injunctive relief and damages adequate to compensate Blue Belt for such infringement.

131.    This case is exceptional, and therefore, Blue Belt is entitled to attorneys' fees pursuant to 35 U.S.C. § 285.

132.    Blue Belt is also entitled to damages under 35 U.S.C. § 284 for Mako's infringement and willful infringement of one or more of claims of the '582 patent.

<u>COUNT IX</u>

**INDIRECT INFRINGEMENT OF THE '582 PATENT (35 U.S.C. § 271(b)-(c))**

133.    Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 132 as if set forth fully herein.

134.    On information and belief, Mako has contributorily infringed and/or actively induced infringement of the '582 patent in violation of 35 U.S.C. § 271(b)-(c), and continues to do so with knowledge of or willful blindness to the existence of the '582 patent, with specific intent to contributorily infringe and/or to induce infringement, and with knowledge of or willful blindness that the induced acts would constitute patent infringement.  On information and belief, each of the TGS surgical robotic assistance system, the RIO Robotic Arm Interactive Orthopedic device, and the Restoris implant, each sold or offered for sale by Mako, is not a staple article of commerce, is material to practicing the invention in the claims of the '582 patent, and has no substantial non-infringing uses.  For example, Mako's tactile robotic arm and patient-specific visualization system is designed specifically to control the movements of the robotic arm and continuously track and associate the location of both the robotic arm and diseased portions of the patient's joint, as described in the '582 patent's claims.

135.    Mako's indirect infringement has occurred by Mako's engaging in at least the following activities: designing and manufacturing the RIO and TGS systems and their components specifically for sale and use in the United States, including Florida; selling and offering to sell these systems and their components in the United States, including Florida; and soliciting, encouraging, and enabling infringing activity in the United States, including Florida, through promotional and instructional materials and activities relating to MAKOplasty or the RIO

41

or TGS systems, and by assisting directly in procedures performed using the RIO and TGS systems.

136.    MAKO's acts of contributory infringement and/or inducing infringement of the '582 patent have caused and will continue to cause Blue Belt substantial and irreparable injury, for which Blue Belt is entitled to receive injunctive relief and damages adequate to compensate Blue Belt for such infringement.

137.    This case is exceptional, and therefore, Blue Belt is entitled to attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT X

### DIRECT INFRINGEMENT OF THE '411 PATENT (35 U.S.C. § 271(a))

138.    Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 137 as if set forth fully herein.

139.    The '411 patent, entitled "Methods and Systems to Control a Shaping Tool," was duly and legally issued by the U.S. Patent and Trademark Office on March 20, 2001.  Blue Belt has the right to commence an action for infringement of the '411 patent.  A true and correct copy of the '411 patent is attached as **Exhibit B**.

140.    All conditions precedent to the maintenance of Blue Belt's claim of patent infringement by Mako have occurred or been performed or have been waived.

141.    In violation of 35 U.S.C. § 271(a), Mako has infringed in the past and continues to directly infringe the '411 patent in this judicial district and elsewhere in the United States.  Mako has infringed and has continued to infringe through the manufacture, use, offer for sale, sale, and/or importation of products, associated software, and components, including, without

limitation, the RIO Robotic Arm Interactive Orthopedic device, the Tactile Guidance System ("TGS"), and Restoris implants.

142.   Mako was aware of the existence of the '411 patent before the filing of this counterclaim, continues to manufacture, use, sell, offer to sell and/or import products, associated software, and components, including, without limitation, the RIO Robotic Arm Interactive Orthopedic device, the Tactile Guidance System ("TGS"), and Restoris implants in willful, intentional, and deliberate infringement of one or more of claims of the '411 patent.

143.   Mako's acts of infringement of the '411 patent have caused and will continue to cause Blue Belt substantial and irreparable injury, for which Blue Belt is entitled to receive injunctive relief and damages adequate to compensate Blue Belt for such infringement.

144.   This case is exceptional, and therefore, Blue Belt is entitled to attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT XI

## INDIRECT INFRINGEMENT OF THE '411 PATENT (35 U.S.C. § 271(b)-(c))

145.   Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 144 as if set forth fully herein.

146.   On information and belief, Mako has contributorily infringed and/or actively induced infringement of the '411 patent in violation of 35 U.S.C. § 271(b)-(c), and continues to do so with knowledge of or willful blindness to the existence of the '411 patent, with specific intent to contributorily infringe and/or to induce infringement, and with knowledge of or willful blindness that the induced acts would constitute patent infringement.  On information and belief, each of the TGS surgical robotic assistance system, the RIO Robotic Arm Interactive Orthopedic device, and the Restoris implant, each sold or offered for sale by Mako, is not a staple article of

commerce, is material to practicing the invention in the claims of the '411 patent, and has no substantial non-infringing uses.  For example, Mako's tactile robotic arm and patient-specific visualization system is designed specifically to facilitate the implantation of an artificial implant in a patient's joint through patient-specific modeling, as described in the '411 patent's claims.

147.    Mako's indirect infringement has occurred by Mako's engaging in at least the following activities: designing and manufacturing the RIO and TGS systems and their components specifically for sale and use in the United States, including Florida; selling and offering to sell these systems and their components in the United States, including Florida; and soliciting, encouraging, and enabling infringing activity in the United States, including Florida, through promotional and instructional materials and activities relating to MAKOplasty or the RIO or TGS systems, and by assisting directly in procedures performed using the RIO and TGS systems.

148.    MAKO's acts of contributory infringement and/or inducing infringement of the '411 patent have caused and will continue to cause Blue Belt substantial and irreparable injury, for which Blue Belt is entitled to receive injunctive relief and damages adequate to compensate Blue Belt for such infringement.

149.    This case is exceptional, and therefore, Blue Belt is entitled to attorneys' fees pursuant to 35 U.S.C. § 285.

<u>**COUNT XII**</u>

**UNFAIR TRADE PRACTICES - UNLAWFUL BELOW COST SALES**

**(Cal. Bus. & Prof. Code § 17043)**

150.    Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 149  as if set forth fully herein.

151.    On information and belief, Mako has offered for sale and/or sold the RIO system in California at a price below Mako's cost to produce the RIO system, such cost being based on Mako's fixed and variable costs related to the RIO system.

152.    As set forth herein and on information and belief, Mako has offered to give away or given away the RIO system in California for free.

153.    On information and belief, Mako's purpose in selling and/or offering to sell the RIO system at a price below cost and/or giving away the RIO system for free was to injure competitors and/or destroy competition, including the purpose of injuring Blue Belt.

154.    As a result of Mako's actions described herein, and because Mako's RIO system is in direct competition with Blue Belt's NavioPFS, on information and belief Blue Belt was harmed in the form of lost sales of its NavioPFS system, as well as lost sales of orthopedic implants and support services made and/or sold by Blue Belt and its business partners.

155.    On information and belief, Mako's actions described herein were a substantial factor in causing the above-described harm to Blue Belt.  Had Mako not engaged in such actions, Blue Belt would have executed additional sales and service contracts for its NavioPFS system and related products and services.

## COUNT XIII

## UNFAIR TRADE PRACTICES - UNLAWFUL LOSS LEADER SALES

### (Cal. Bus. & Prof. Code § 17044)

156.    Blue Belt repeats and re-alleges each and every allegation of paragraphs 1 through 155 as if set forth fully herein.

157.    As set forth herein and on information and belief, Mako has offered for sale, sold, and/or offered the use of the RIO system in California at a price below Mako's cost to produce

the RIO system, such cost being based on Mako's fixed and variable costs related to the RIO system.

158.   As set forth herein and on information and belief, Mako has offered to give away or given away the RIO system in California for free.

159.   On information and belief, Mako's purpose in selling, offering to sell, offering the use of, and/or giving away the RIO system was to influence, promote, or encourage the purchase of other products and services from Mako, including but not limited to Mako's orthopedic implants and technological supports services related to the RIO system,

160.   On information and belief, Mako's sales, offers to sell, offers to use, and/or giving away of the RIO system took business away from Blue Belt in the form of lost sales of the NavioPFS and related products and services.

161.   On information and belief, Mako's intent and purpose for the actions described herein was to injure competitors and destroy competition, including the intent and purpose to injure Blue Belt.

162.   As a result of Mako's actions described herein, and because Mako's RIO system is in direct competition with Blue Belt's NavioPFS, on information and belief Blue Belt was harmed in the form of lost sales of its NavioPFS system, as well as lost sales of orthopedic implants and support services made and/or sold by Blue Belt and its business partners.

163.   On information and belief, Mako's actions described herein were a substantial factor in causing the above-described harm to Blue Belt.  Had Mako not engaged in such actions, Blue Belt would have executed additional sales and service contracts for its NavioPFS system and related products and services.

## DEMAND FOR RELIEF

Blue Belt respectfully requests that this Court enter judgment in Blue Belt's favor on Counts I through XIII of its Counterclaims against Mako and AOI, and grant Blue Belt the following relief:

A.     A declaration that each of the claims of the '417 patent is invalid or unenforceable;

B.     A declaration that Blue Belt does not directly or indirectly infringe any claim of the '417 patent, either literally or under the doctrine of equivalents;

C.     A declaration that the '417 is unenforceable;

D.     A determination that Mako's infringement of the '582 and '411 patents is and has been willful, and that this is an exceptional case under 35 U.S.C. § 285;

E.     An award of all available damages, including, but not limited to:  for Counts IV, V, VI, VII, XII, and XIII, compensatory, actual, and consequential damages, and Mako's profits gained; and for Counts VIII, IX, X, and XI, Blue Belt's lost profits from Mako's infringement of the '582 and '411 patents, but in any event not less than a reasonable royalty;

F.     An award of treble damages for all counts available;

G.     An injunction ordering Mako to deliver up and destroy all false advertisements regarding Blue Belt and restraining Mako and its affiliates, subsidiaries, officers, directors, agents, servants, employees, representatives, licensees, successors, assigns, and all those acting for them and on their behalf, from engaging in further false advertising regarding Blue Belt;

H.     An injunction restraining Mako and its affiliates, subsidiaries, officers, directors, agents, servants, employees, representatives, licensees, successors, assigns, and all those acting for them and on their behalf, from continuing their deceptive and unfair trade practices in offering

for sale or selling RIO systems, at a price below Mako's cost to produce the RIO system, or giving away the RIO system, to eliminate the competition;

I.      An injunction restraining Mako and its affiliates, subsidiaries, officers, directors, agents, servants, employees, representatives, licensees, successors, assigns, and all those acting for them and on their behalf, from continuing their deceptive and unfair trade practices, and requiring Mako to take all actions reasonably necessary to remediate the harm caused to Blue Belt's reputation;

J.      An injunction restraining Mako and its affiliates, subsidiaries, officers, directors, agents, servants, employees, representatives, licensees, successors, assigns, and all those acting for them and on their behalf, from continuing to interfere with Blue Belt's business relationships with its current and prospective customers and employees;

K.      An injunction restraining Mako and its affiliates, subsidiaries, officers, directors, agents, servants, employees, representatives, licensees, successors, assigns, and all those acting for them and on their behalf, from further infringement, further inducements of infringement, and further contributions to infringement of the '582 and '411 patents;

L.      A declaration that this is an exceptional case, and an award of attorneys' fees, costs, expenses, and pre-judgment and post-judgment interest at the highest rate allowable by law on all counts available; and

M.      Such other relief as this Court deems just and proper.

## **JURY DEMAND**

Blue Belt hereby demands trial by jury in this action of all issues and claims triable by right of jury.

Dated:  September 19, 2014        Respectfully submitted,

**FELDMAN GALE LLP**
One Biscayne Tower, Suite 3000
Two South Biscayne Boulevard
Miami, FL 33131
Telephone No. (305) 358-5001
Facsimile No. (305) 358-3309

By:  /s/ *Richard Guerra*
    James A. Gale
    Florida Bar No. 371726
    Email: jgale@feldmangale.com
    Richard Guerra
    Florida Bar No. 689521
    EMail: rguerra@feldmangale.com

**GIBSON, DUNN & CRUTCHER LLP**
Josh Krevitt *(Admitted Pro Hac Vice)*
Email: jkrevitt@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone No. (212) 351-4000
Facsimile No. (212) 351-4035

**GIBSON, DUNN & CRUTCHER LLP**
Wayne M. Barsky *(Admitted Pro Hac Vice)*
Email: wbarsky@gibsondunn.com
Timothy P. Best *(Admitted Pro Hac Vice)*
Email: tbest@gibsondunn.com
2029 Century Park East
Los Angeles, CA 90067
Telephone No. (310) 557-8500
Facsimile No. (310) 552-7010

**GIBSON, DUNN & CRUTCHER LLP**
Stuart M. Rosenberg *(Admitted Pro Hac Vice)*
Email: srosenberg@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA 94304
Telephone No. (650) 849-5300
Facsimile No. (650) 849-5333

*Counsel for Defendant Blue Belt Technologies, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on September 19, 2014, I electronically filed the foregoing document with the Clerk of the Court CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

*/s Richard Guerra*_____
Richard Guerra

## SERVICE LIST

*Mako Surgical Corp., et al. v. Blue Belt Technologies, Inc.*
**Case No.: 1:14-cv-61263-DPG/WCT**
**United States District Court, Southern District of Florida**

**Shook, Hardy & Bacon LLP**
Humberto H. Ocariz
Email:  hocariz@shb.com
Miami Center, Suite 3200
201 S. Biscayne Boulevard
Miami, FL 33131
Direct Office No.  (305) 960-6939
Office Main No.  (305) 358-5171
Facsimile No.  (305) 358-7470
*Via CM/ECF*

**Morrison & Foerster LLP**
Wendy J. Ray (*Admitted Pro Hac Vice*)
Email:  wray@mofo.com
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017
Telephone No.  (213) 892-5200
Facsimile No.  (213) 892-5454
*Via CM/ECF*

**Morrison & Foerster LLP**
Wesley E. Overson (*Admitted Pro Hac Vice*)
Email:  woverson@mofo.com
Danielle Coleman (*Admitted Pro Hac Vice*)
Email:  dcoleman@mofo.com
Elizabeth A. Patterson (*Admitted Pro Hac Vice*)
Email:  epatterson@mofo.com
425 Market Street
San Francisco, CA 94105
Telephone No.  (415) 268-7000
Facsimile No.  (415) 268-7522
*Via CM/ECF*

*Counsel for Plaintiffs*
*Mako Surgical Corp. and All-of-Innovation GmbH*

101796680